[No. S033642. Mar. 5, 1996.]

RICHARD K. EHRLICH, Plaintiff and Appellant, v.
CITY OF CULVER CITY et al., Defendants and Appellants.

**COUNSEL**

Edward J. Horowitz and Lisa S. Ehrlich for Plaintiff and Appellant.

Paul B. Campos, Nicholas Cammorata, Ronald A. Zumbrun, Edward J. Connor, Jr., Timothy A. Bittle, James S. Burling, Daniel J. Popeo, Paul D. Kamenar, Rubenstein & Bohachek, Earl L. Bohachek, McCutchen, Doyle, Brown & Enersen, Maria P. Rivera, Stephen L. Kostka, Geoffrey L. Robinson, Barbara J. Schussman, Cox, Castle & Nicholson and Kenneth B. Bley as Amici Curiae on behalf of Plaintiff and Appellant.

Norman Y. Herring, City Attorney, Evelyn Keller and Carol Schwab, Deputy City Attorneys, Freilich, Kaufman, Fox & Sohagi, Benjamin Kaufman, Kane, Ballmer & Berkman, Michael D. Montoya, Pamela S. Schmidt and Joseph W. Pannone for Defendants and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens, Assistant Attorney General, Richard M. Frank and Linus Masouredis, Deputy Attorneys General, Louise H. Renne, City Attorney (San Francisco), Andrew W. Schwartz, Deputy City Attorney, David R. Chapman, City Attorney (Escondido), Jeffrey R. Epp, Assistant City Attorney, Sharon Dennis, John Echeverria and Mary Minette as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

ARABIAN, J.*—This case comes to us by a circuitous route, having been remanded after the United States Supreme Court issued a writ of certiorari to the Court of Appeal and vacated that court's judgment in favor of defendant City of Culver City. The high court's order of remand directed the Court of Appeal to reexamine its prior judgment "in light of *Dolan* v. *City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309]. . . ." (*Ehrlich* v. *City of Culver City* (1994) 512 U.S. __ [129 L.Ed.2d 854, 114 S.Ct. 2731].)

Following remand, a divided Court of Appeal reaffirmed its earlier ruling in favor of defendant city in an unpublished opinion. We then granted the petition for review by plaintiff, a property owner and developer, to consider important and unsettled questions concerning the extent to which the high court's opinions in *Dolan* v. *City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309] (*Dolan*) and the earlier case of *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] (*Nollan*) apply to development permits that exact a *fee* as a condition of issuance, rather than, as in both *Nollan* and *Dolan*, the *possessory* dedication of real property.

As we explain, we conclude that the tests formulated by the high court in its *Dolan* and *Nollan* opinions for determining whether a compensable regulatory taking has occurred under the takings clause of the Fifth Amendment to the federal Constitution apply, *under the circumstances of this case*, to the *monetary* exaction imposed by Culver City as a condition of approving plaintiff's request that the real property in suit be rezoned to permit the construction of a multi-unit residential condominium. We thus reject the city's contention that the heightened takings clause standard formulated by the court in *Nollan* and *Dolan* applies *only* to cases in which the local land use authority requires the developer to dedicate real property to public use as a condition of permit approval.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

We arrive at this conclusion not by reference to the constitutional takings clause alone, but within the statutory framework presented by the Mitigation Fee Act. (Gov. Code, § 66000 et seq.) We will conclude in this case that, in order to avoid substantial questions concerning the constitutional sufficiency of the legislative standard embodied in the act, the tests formulated by the high court in its *Dolan* and *Nollan* opinions for determining when a regulatory taking has occurred apply here to the act's requirement that the local regulatory authority demonstrate a "reasonable relationship" between the monetary exaction and the public impact of the development.

We thus interpret the act's "reasonable relationship" standard, as applied to the development fee at issue in this case, as embodying the standard of review formulated by the high court in its *Nollan* and *Dolan* opinions —proof by the local permitting authority of both an "essential nexus" or relationship between the permit condition and the public impact of the proposed development, and of a "rough proportionality" between the magnitude of the fiscal exaction and the effects of the proposed development.

Applying this standard in this case, we conclude, first, that the city has met its burden of demonstrating the required connection or nexus between the rezoning—to permit a residential use of a parcel of land zoned for private recreational use—and the imposition of a monetary exaction to be expended in support of recreational purposes as a means of mitigating that loss. We conclude, however, that the record before us is *in*sufficient to sustain the city's determination that plaintiff pay a so-called mitigation fee of $280,000 as a condition for approval of his request that the property be rezoned to permit the construction of a condominium project. Because the city may be able to justify the imposition of *some* fee under the recently minted standard of *Dolan*, we follow the Oregon Supreme Court's disposition in that case and direct that the cause be remanded to the city for additional proceedings in accordance with this opinion.

I

*Factual and Procedural Background*

A

Between 1973 and 1975, plaintiff acquired a vacant 2.4-acre lot on Overland Avenue in Culver City and obtained city approval to develop the site as a private tennis club and recreational facility. At plaintiff's request, the city amended its zoning and general plan ordinances governing uses on the property from a split zone R-1 (single-family residential) and C-2 (retail

commercial) to C-3 (commercial). A specific plan was also adopted by the city providing for the development of a privately operated tennis club and recreational facility.[1] A report prepared by city planning officials in 1974 recommending approval of the development permit recognized that "the need for additional tennis facilities in this city is a real one"; the planning commission resolution recommending approval likewise observed that "[t]he proposed zoning of the property in conjunction with the specific plan will provide a suitably located area within the City for additional tennis club facilities in the form of a private tennis club." From 1975 to 1988, plaintiff, alone or through others, operated the sports complex—consisting by then of a swimming pool, five tennis courts, racquetball courts, and weight training and aerobic facilities—on the site.

In 1981, in response to financial losses, plaintiff applied to the city for a change in land use in order to construct an office building on the site; that application was abandoned after the city planning commission recommended against approval on the ground that the existing sports and tennis club provided a needed commercial recreational facility within the city. The club continued in operation under a series of managers until August 1988, when plaintiff closed it as a result of continuing financial losses. The following month, he again applied to the city for an amendment to the general plan, a zoning change and amendment of the specific plan to allow construction of a 30-unit condominium complex valued at $10 million.

Shortly after the submission of plaintiff's application, the city expressed an interest in acquiring the property for operation as a municipally owned sports facility and hired outside consultants to study the feasibility of the acquisition. The impetus behind the city's interest was a perceived deficiency in existing municipal recreational facilities. Buying the property, according to a city council staff report, offered the "opportunity to preserve an existing sports/recreational facility for public use and relieve pressure on existing facilities." The feasibility study concluded that, by national standards, the city was two to four tennis courts short, and deficient in the number of its public swimming pools and gymnasiums. The study also concluded that plaintiff's club had encountered financial problems through a combination of management problems, poor maintenance, and a lack of competitive amenities offered by other clubs. Without extensive capital improvements, the study concluded, the club could not "compete financially in today's health and fitness market."

Based upon the findings of the study, the city concluded that it lacked the funds to purchase and operate the club as a general public sports complex,

---

[1]A "specific plan" implements and refines the general plan by allowing for greater specificity as to permissible uses. (Gov. Code, § 65450.)

and would incur substantial financial risks if it purchased and operated the club on a limited membership, fee-for-service basis. In April 1989, the city decided not to purchase the property. At the same time, the city council disapproved plaintiff's application based on concerns over the loss of a recreational land use needed by the community. In the meantime, plaintiff obtained a demolition permit and tore down the existing site improvements. The still-useful equipment, including the tennis court lights, nets, and lockers, he donated to the city.

Following the rejection of his application, plaintiff entered into discussions with members of the city council and city staff in an attempt to restructure the project. He asserts that he was informed the project would not be approved *unless* he agreed to build new recreational facilities for the city. In response, plaintiff apparently raised the possibility of constructing four new municipal tennis courts. During this time period plaintiff filed, but did not serve, a petition for writ of mandate and complaint for damages commencing this lawsuit. Following a closed-door meeting ostensibly to discuss the pending litigation, the city council voted to approve plaintiff's application conditioned upon the payment of certain monetary exactions. In lieu of the construction of four tennis courts as a condition of approval, the city required the payment of $280,000 "to be used" as stated in the ratifying ordinance, "for additional [public] recreational facilities as directed by the City Council." The minutes of the city council meeting state that the $280,000 fee was to be used "for partial replacement of the lost recreational facilities . . ." occasioned by the specific plan amendment. The amount of the fee was based upon a city study which showed that the replacement costs for the recreational facilities "lost" as a result of amending the specific plan would be $250,000 to $280,000 for the pool, $135,000 to 150,000 for the paddle tennis courts, and $275,000 to $300,000 for the tennis courts.

In addition to the $280,000 recreation fee, the city also required plaintiff to pay an exaction under the city's "art in public places" program. By municipal ordinance, new residential development projects of more than four units, as well as all commercial, industrial, and public building projects with a building valuation exceeding $500,000, are required to provide "art work" (as defined by the ordinance) for the project in an amount equal to 1 percent of the total building valuation, or to pay an equal amount in cash to the city art fund. The city valued plaintiff's project at $3.2 million. He elected initially to pay the fee, which totaled $33,200, but his successor in interest

apparently subsequently placed art of his own choosing on the site rather than pay the in-lieu fee.[2]

Thereafter, plaintiff filed with the city formal written protests to the imposition of the $280,000 recreation fee and the $33,200 art in public places exaction, pursuant to Government Code sections 66020 and 66021. The city rejected both protests. Plaintiff then amended his complaint to allege that imposition of the fees amounted to an unconstitutional taking without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution and article I, section 19 of the California Constitution.[3] The parties later entered into an agreement whereby plaintiff agreed to pay the $280,000 recreation fee under protest in exchange for the necessary building and grading permits for the project. Plaintiff retained the right to proceed with his lawsuit, and agreed that the city would obtain a lien on the property as security for payment of the $280,000 fee. The site was subsequently developed and residential units were sold to the public.

B

The petition for writ of mandate, by which plaintiff sought to set aside the $280,000 recreation fee and the $33,200 in-lieu art fee as unconstitutional takings, was bifurcated from the balance of the complaint. Following a hearing, the trial court invalidated the $280,000 recreation fee, holding that there was "no reasonable relation . . . between the plaintiff's project and the need for public tennis courts in the City." The trial court concluded that the exaction was "simply an effort to shift the cost of providing a public benefit to one no more responsible for the need than any other taxpayer." The trial court declined to set aside the $33,200 art fee, however, ruling that it was not an unconstitutional taking.

The Court of Appeal initially affirmed the judgment in its entirety but on rehearing modified its opinion to reverse that portion of the judgment

---

[2]Plaintiff was also apparently required to pay a $30,000 in-lieu "parkland" fee pursuant to section 33-E.1 of the Culver City Municipal Code, to provide ostensibly for local park and recreational facilities to serve the residents of plaintiff's condominium development. Plaintiff has not challenged this in-lieu fee in the present action.

[3]The Fifth Amendment provides that "No person shall be . . . deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation." The Fifth Amendment was made applicable to the states through the Fourteenth Amendment in *Chicago, B & Q Ry. Co.* v. *Chicago* (1897) 166 U.S. 226 [41 L.Ed. 979, 17 S.Ct. 581].

The parallel provision of the California Constitution provides, "Private property may be taken or damaged for public use only when just compensation . . . has first been paid to, or into court for, the owner." (Cal. Const., art. I, § 19.)

invalidating the $280,000 recreation fee. (*Ehrlich* v. *City of Culver City* (1993) 15 Cal.App.4th 1737 [19 Cal.Rptr.2d 468].) The Court of Appeal found there was a "substantial nexus" (*id.* at p. 1749) between the proposed condominium project and the $280,000 exaction. "The mitigation fee was imposed to compensate the City for the benefit conferred on the developer by the City's approval of the townhome project and for the burden to the community resulting from the loss of recreational facilities." (*Id.* at p. 1750.) Thus, the recreation fee was not, in the Court of Appeal's judgment, an unconstitutional taking without just compensation. The Court of Appeal also affirmed that portion of the judgment upholding the in-lieu art fee.

Plaintiff then sought certiorari from the United States Supreme Court. The high court granted his petition, vacated the Court of Appeal judgment, and remanded the case for further consideration in light of its opinion in *Dolan*. (*Ehrlich* v. *City of Culver City, supra,* 512 U.S. __ [129 L.Ed.2d 854, 114 S.Ct. 2731].) As noted, following remand, a divided Court of Appeal reached the identical result. In addition to its earlier conclusions, it found that the $280,000 fee was "roughly proportional" in nature and extent to the needs generated by the project, and therefore passed muster under *Dolan, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 320, 114 S.Ct. at pp. 2319-2320]. We granted plaintiff's petition for review and now reverse.

## II

*The Mitigation Fee Act (Gov. Code, § 66000 et seq.)*

As noted, this case arises within the statutory framework of the Mitigation Fee Act (the Act), introduced in the Legislature as Assembly Bill No. 1600, 1987-1988 Regular Session, and enacted as Statutes 1987, chapter 927, effective January 1, 1989. The Act, codified as sections 66000-66003 of the Government Code, sets forth procedures for protesting the imposition of fees and other monetary exactions imposed on a development by a local agency. As its legislative history evinces, the Act was passed by the Legislature "in response to concerns among developers that local agencies were imposing development fees for purposes unrelated to development projects." (*Centex Real Estate Corp.* v. *City of Vallejo* (1993) 19 Cal.App.4th 1358, 1361 [24 Cal.Rptr.2d 48]; Sen. Local Gov. Com. analysis of Assem. Bill No. 1600 (1987-1988 Reg. Sess.) p. 1; see also *Garrick Development Co.* v. *Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320 [4 Cal.Rptr.2d 897].)

Plaintiff complied with the requirements of Government Code section 66020 by filing a protest with the city which enumerated all of the bases of his challenge to the recreational and art fees, including his constitutional

takings claim. These claims were subsequently set forth in the complaint and writ petition. In the subsequent agreement between plaintiff and the city, plaintiff agreed to pay the disputed fees and to have a lien recorded against the property, and the city agreed to allow the project to proceed, and further stipulated that "[n]othing in this agreement shall in any way waive or restrict [plaintiff's] rights to pursue the protest [plaintiff] has made under [former] Government Code § 66008 [now section 66020] and by the above-mentioned lawsuit." Thus, the agreement expressly preserved both the statutory claim under the Act and the takings claims set forth in plaintiff's statutory protest and in his lawsuit.[4]

Although for the most part procedural in nature, the Act also embodies a statutory standard against which monetary exactions by local governments subject to its provisions are measured. Government Code section 66001 requires the local agency to determine "how there is a *reasonable relationship*" between the proposed use of a given exaction and both "the type of development project" and "the need for the public facility and the type of development project on which the fee is imposed." (Gov. Code, § 66001, subd. (a)(3), (4), italics added.) In addition, the local agency must determine how there is a *"reasonable relationship"* between "the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed." (*Id.,* § 66001, subd. (b), italics added.)

■ The Act thus codifies, as the statutory standard applicable by definition to nonpossessory monetary exactions, the "reasonable relationship" standard employed in California and elsewhere to measure the validity of required dedications of land (or fees imposed in lieu of such dedications) that are challenged under the Fifth and Fourteenth Amendments. (See, e.g., *Ayres* v. *City Council of Los Angeles* (1949) 34 Cal.2d 31 [207 P.2d 1, 11 A.L.R.2d 503]; *Associated Home Builders etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847] *(Associated Home Builders); Grupe* v. *California Coastal Com.* (1985) 166 Cal.App.3d 148 [212 Cal.Rptr. 578]; cf. *Nollan, supra,* 483 U.S at pp. 839-840 [97 L.Ed.2d at pp. 690-691]; *Dolan, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 320, 114 S.Ct. at p. 2319] ["Some form of the reasonable relationship test has been adopted in many . . . jurisdictions."].)

---

[4]In its brief on the merits, the city has raised two additional issues. It asserts that plaintiff preserved *only* his right to challenge the exactions under the Act. This argument was not raised below or in a counterpetition for review; it is therefore not cognizable before this court. (Cal. Rules of Court, rule 29(b)(1).) Furthermore, it is factually inaccurate. The city also asserts that the takings challenge is somehow not "ripe" because plaintiff waived all but his statutory challenge to the fees. The argument was not raised below and is therefore not cognizable before this court. Moreover, as noted above, it is also factually untenable.

■ As we explain, the high court's opinions in *Nollan* and *Dolan* cast substantial doubt on the sufficiency of the *Associated Home Builders* standard, at least as applied to cases such as this one, where the property owner challenges an individualized exaction imposed as a condition of issuance of a development permit as an uncompensated taking under the Fifth Amendment. The high court's recent takings jurisprudence, as we comprehend it, underlines the separate nature of the takings clause as an independent constitutional guarantee, one that is not only distinct from the commands of the due process and equal protection provisions of the federal Constitution, but which embodies a standard of judicial review that is greater than the "minimal level of scrutiny" mandated by those provisions. (*Dolan, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 320, 114 S.Ct. at p. 2319].)

We do not believe, however, that these conceptual obscurities need cause problems in practice. Although the Act predates the formulation adopted by the high court in *Dolan,* we believe the Act's "reasonable relationship" language should be construed in light of *Dolan*'s "rough proportionality" test for two reasons. First, the statutory scheme authorizes "*any party* on whom a fee, tax, assessment, dedication, reservation, or *other exaction* has been imposed, the payment or performance of which is required to obtain governmental approval of a development," to protest such an imposition by following the procedures provided in section 66020 of the Act. (Gov. Code, § 66021, subd. (a), italics added.) Such a broadly formulated and unqualified authorization is consistent with the view that the Legislature intended to require *all* protests to a development fee that challenge the sufficiency of its relationship to the effects attributable to a development project—regardless of the legal underpinnings of the protest—to be channeled through the administrative procedures mandated by the Act. Such claims would encompass not only statutory grounds, but contentions that a given imposition offends the commands of the takings clause of the Fifth Amendment. Requiring that constitutionally based claims be determined under the provisions of the Act does not itself raise a constitutional issue " '[i]f the government has provided an adequate process for obtaining compensation, and if resort to that process "yield[s] just compensation," . . . .' " (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 13 [32 Cal.Rptr.2d 244, 876 P.2d 1043], quoting *Williamson Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172, 194-195 [87 L.Ed.2d 126, 143-144, 105 S.Ct. 3108].) This is so because the Fifth Amendment "leaves to the state . . . the procedures by which compensation may be sought." (8 Cal.4th at p. 13.)

Second, because the Legislature incorporated into Government Code section 66001, subdivision (a)(3) of the Act a standard that generally corresponds to the one reflected in the high court's takings jurisprudence (see

*Dolan, supra,* 512 U.S. at p. ___ [129 L.Ed.2d at p. 320, 114 S.Ct. at p. 2319] ["We think the 'reasonable relationship' test adopted by a majority of the state courts is closer to the federal constitutional norm . . . . [W]e do not adopt it as such, partly because the term . . . seems confusingly similar to the term 'rational basis' . . . ."]), it is appropriate for this court to interpret the statutory standard in a manner consistent with the high court's decisions in *Nollan* and *Dolan* so that a development fee imposed pursuant to the act, and that satisfies its requirements, will not be subject to challenge on constitutional grounds. By interpreting the "reasonable relationship" standard adopted by Government Code section 66001 as imposing a requirement consistent with the *Nollan/Dolan* standard, we serve the legislative purpose of protecting developers from disproportionate and excessive fees, and carry out the legislative intent of imposing a statutory relationship between monetary exaction and development project that accurately reflects the prevailing takings clause standard.[5]

We must, in other words, recognize that in the wake of *Dolan* the term "reasonable relationship" embraces both constitutional and statutory meanings which, for all practical purposes, have merged *to the extent* that the *Dolan* decision applies to development fees—an issue we address below. Thus, developers who wish to challenge a development fee on either statutory or constitutional grounds must do so via the statutory framework provided by the Act. (Cf. *Hensler* v. *City of Glendale, supra,* 8 Cal.4th at pp. 13-15.)

### III

#### *"Leveraging" the Permit Power and the Takings Clause*

Our account of the factual record should make it clear that we view this case as one presenting the earmarks of what has come to be characterized in recent takings jurisprudence as a form of regulatory "leveraging." We mean to convey by such a characterization what Justice Scalia appears to have had in mind when, describing the California Coastal Commission's exaction of a beachfront easement from a homeowner as a condition of

---

[5]Contrary to the assertion of Justice Kennard that "[t]his case was litigated under the takings clause, not our state's Mitigation Fee Act; thus, there is no need to construe the Mitigation Fee Act to decide this case" (conc. & dis. opn. of Kennard, J., *post,* at p. 903), plaintiff complied with the requirements of the Act by asserting both statutory *and* the constitutional takings claims in his protest. (See fn. 4, *ante,* at p. 865.) We resolve plaintiff's claim in the context of the Act for the reasons set forth in the main text, that is, the unqualified statutory language channeling all protests to development fees through the procedures prescribed by the Act and the formulaic identity of the statutory and constitutional standards.

issuing a development permit, he wrote in *Nollan, supra,* 483 U.S. 825, that "One would expect that a [permit] regime in which this kind of *leveraging* [i.e., the imposition of *unrelated* exactions as a condition for granting permit approval] of the police power is allowed would produce stringent land-use regulation which the State then waives to accomplish other purposes . . . ." (*Id.* at p. 837, fn. 5 [97 L.Ed.2d at p. 690], italics added.)

In our view, the intermediate standard of judicial scrutiny formulated by the high court in *Nollan* and *Dolan* is intended to address just such indicators in land use "bargains" between property owners and regulatory bodies—those in which the local government conditions permit approval for a given use on the owner's surrender of benefits which *purportedly* offset the impact of the proposed development. It is in this paradigmatic permit context—where the individual property owner-developer seeks to negotiate approval of a planned development—that the combined *Nollan* and *Dolan* test quintessentially applies. Its effect, at least as to those conditions that fail to exhibit the constitutionally required nexus, is to rule out the imposition of a certain species of regulatory conditions: those which are either logically unrelated to legitimate regulatory objectives or fail to exhibit the constitutionally required "fit" between conditional means and legitimate governmental ends.

Where the local permit authority seeks to justify a given exaction as an alternative to denying a proposed use, *Nollan* requires a reviewing court to scrutinize the instrumental efficacy of the permit condition in order to determine whether it logically furthers the *same* regulatory goal as would outright denial of a development permit. A court must also, under the standard formulated in *Dolan,* determine whether the factual findings made by the permitting body support the condition as one that is more or less proportional, in both nature and scope, to the public impact of the proposed development.

Thus, although we conclude that the combined test of *Nollan* and *Dolan* applies to the *monetary* exaction imposed by Culver City in this case, we also conclude that the heightened standard of scrutiny is triggered by a relatively narrow class of land use cases—those exhibiting circumstances which increase the risk that the local permitting authority will seek to avoid the obligation to pay just compensation. Neither *Nollan* nor *Dolan* is, after all, a conventional regulatory takings case. Rather, as the court's rationale for its result in *Nollan* demonstrates, both are cases in which the local government attached a condition to the issuance of a development permit which, *but for* the claim that the exaction is justified by the greater power to deny a permit altogether, would have amounted to an uncompensated requisition of private property.

As Justice Scalia's opinion in *Nollan, supra,* 483 U.S. 825, makes clear, such a discretionary context presents an inherent and heightened risk that local government will manipulate the police power to impose conditions *unrelated* to legitimate land use regulatory ends, thereby avoiding what would otherwise be an obligation to pay just compensation. In such a context, the heightened *Nollan-Dolan* standard of scrutiny works to dispel such concerns by assuring a constitutionally sufficient link between ends and means. It is the imposition of land-use conditions in individual cases, authorized by a permit scheme which by its nature allows for both the discretionary deployment of the police power and an enhanced potential for its abuse, that constitutes the sine qua non for application of the intermediate standard of scrutiny formulated by the court in *Nollan* and *Dolan.*

The remainder of our opinion seeks to demonstrate the accuracy of these conclusions, which we then apply to the record before us in this case.[6]

A

*Nollan and the "Essential Nexus" Standard*

In *Nollan, supra,* 483 U.S. 825, residential property owners challenged a requirement of the California Coastal Commission that they grant a lateral easement for public access across the back (or seaside) of their beachfront property as a condition for approval of a building permit to construct a larger

---

[6]Scholarly comment on the two cases is almost unmanageably large. (See, e.g., Kmiec, *At Last, The Supreme Court Solves the Takings Puzzle* (1995) 19 Harv. J. L. & Pub. Pol'y. 147; Kendall & Ryan, *"Paying" for the Change: Using Eminent Domain to Secure Exactions and Sidestep Nollan and Dolan* (1995) 81 Va. L. Rev. 1801; Funk, *Reading Dolan v. City of Tigard* (1995) 25 Envtl. L. 127; Huffman, *Dolan v. City of Tigard: Another Step in the Right Direction* (1995) 25 Envtl. L. at p. 143; Kushner, *Property and Mysticism: The Legality of Exactions as a Condition for Public Development Approval in the Time of the Rehnquist Court* (1992) 8 J. Land Use & Envtl. L. 53; Been, *'Exit' as a Constraint on Land Use Exactions: Rethinking the Unconstitutional Conditions Doctrine* (1991) 91 Colum. L. Rev. 473; Notes, " 'Take' My Beach Please!": Nollan v. California Coastal Commission and a Rational-Nexus Constitutional Analysis of Development Exactions* (1989) 69 B. U. L. Rev. 823; Kmiec, *The Original Understanding of the Taking Clause Is Neither Weak Nor Obtuse* (1988) 88 Colum. L. Rev. 1630; Lawrence, *Means, Motives, and Takings: The Nexus Test of Nollan v. California Coastal Commission* (1988) 12 Harv. Envtl. L. Rev. 231; Epstein, *Unconstitutional Conditions, State Power, and the Limits of Consent* (1988) 102 Harv. L. Rev. 1, 58; Michelman, *Takings, 1987* (1988) 88 Colum. L. Rev. 1600; Epstein, *Takings: Descent and Resurrection* (1987) 1987 Sup. Ct. Rev. 1; Karlin, *Back to the Future: From Nollan to Lochner* (1988) 17 Sw.U. L. Rev. 627; Peterson, *Land Use Regulatory 'Takings' Revisited: The New Supreme Court Approaches* (1988) 39 Hastings L. J. 335; Falik & Shimko, *The "Takings" Nexus—The Supreme Court Chooses a New Direction in Land-Use Planning: A View From California* (1988) 39 Hastings L. J. 359; Note: *Taking a Step Back: A Reconsideration of the Takings Test of Nollan v. California Coastal Commission* (1988) 102 Harv. L. Rev. 448; *The Supreme Court—Leading Cases* (1988) 101 Harv. L. Rev. 119, 240.)

beach house. The issue, as the high court framed it, was not whether the permit condition would have deprived the Nollans of all economically viable use of their property (it would not have), but rather whether the exaction furthered a legitimate state interest. The Coastal Commission argued that the easement condition was necessary to foster "visual access" to the beach and to overcome the "psychological barrier" to its use created by shorefront development. (483 U.S. at p. 835 [97 L.Ed.2d at p. 688].)

The Supreme Court assumed that the purposes advanced by the Coastal Commission represented legitimate state interests and were, at least in the abstract, constitutionally inoffensive. (483 U.S. at pp. 835-836 [97 L.Ed.2d at p. 688].) The court explained, however, that "[t]he evident constitutional propriety disappears . . . if the [permit] condition . . . utterly fails to further the end advanced as the justification for the prohibition." (*Id.* at p. 837 [97 L.Ed.2d at p. 689].) When "that *essential nexus* is eliminated," the court observed, the legitimacy of the exaction is undermined and it "becomes, quite simply, the obtaining of an easement to serve some valid governmental purpose, but without payment of compensation." (*Ibid.*, italics added.) Applying the newly minted "essential nexus" standard, the court found the required relationship between the Nollans' permit condition and the asserted state interest to be absent. The permit condition was an easement for *lateral* access to allow visitors to traverse the Nollans' property while passing from one beach to another. The court found it "quite impossible to understand" how such an easement furthered the "visual access" or lowered the "psychological barriers" of people *already* on the beach. (*Id.* at p. 838 [97 L.Ed.2d at p. 690].) It was this absence of a link between the permit condition and the commission's purported public purpose for requiring it that made the exaction a taking. (*Id.* at pp. 841-842 [97 L.Ed.2d at pp. 691-693].)[7]

---

[7]The *Nollan* majority also made clear that the standard for evaluating a takings claim differs from that applied to a due process challenge. The latter, the majority explained, requires merely that the state "could rationally have decided" that the land-use regulation adopted could achieve its objective, and thus invokes only a minimal level of judicial review. (483 U.S. at p. 834, fn. 3 [97 L.Ed.2d at p. 688], italics omitted.) To survive a takings claim, however, the court stressed that the regulation must "substantially advance" a legitimate state interest. (*Ibid.*) Thus, the *Nollan* majority consciously embraced what Justice Brennan had critically characterized as a more "demanding standard" (483 U.S. at p. 848 [97 L.Ed.2d at p. 696] (dis. opn. of Brennan, J.)) requiring a more "precise fit between the forms of burden and [the permit] condition . . . ." than had previously been demanded for purposes of due process. (*Id.* at p. 847 [97 L.Ed.2d at p. 696].)

In a particularly expressive rejoinder to Justice Brennan, the *Nollan* majority rejected the argument that the easement condition represented a reasonable "exchange" in return for the "benefit" of the development permit, declaring that "the right to build on one's own property—even though its exercise can be subjected to legitimate permitting requirements—

B

*Dolan and the "Rough Proportionality" Standard*

The "essential nexus" test announced in *Nollan* has recently been applied and extended by the high court in *Dolan, supra*, 512 U.S. 374. The facts and the holding in *Dolan* demand our particular attention in view of the court's subsequent grant of certiorari in this case and its order directing the Court of Appeal to reexamine its prior judgment in light of the *Dolan* opinion. The facts were fairly straightforward. The plaintiff, Mrs. Dolan, owned a chain of plumbing and electrical supply stores, one of which—located in the City of Tigard, a Portland, Oregon suburb—she sought to expand by constructing a new building on the existing parcel, nearly doubling the retail sales space. The city had conditioned approval of the necessary building permit on dedications of a portion of the parcel for flood control and traffic improvements. Invoking its local development code, the city had required Mrs. Dolan to dedicate a percentage of the parcel adjacent to a floodplain as part of the city's "Greenway" system to prevent additional stress on its storm drainage system. (*Id.* at p. __ [129 L.Ed.2d at p. 313, 114 S.Ct. at p. 2314].) To relieve traffic congestion in the downtown area, the city had also required the dedication of an additional 15-foot strip of land adjacent to the floodplain as a pedestrian/bicycle pathway. (*Ibid.*)

The city had made generalized findings concerning the relationship between its dedication conditions and the projected impacts of Mrs. Dolan's project. As to the pedestrian pathway, the city's planning commission had found it was " '*reasonable to assume* that customers and employees of the future uses of this site could utilize a pedestrian/bicycle pathway adjacent to this development for their transportation and recreational needs.' " (512 U.S. at p. __ [129 L.Ed.2d at p. 314, 114 S.Ct. at p. 2314], italics added.) As for the drainage system dedication, the planning commission found that the " 'anticipated increased storm water flow from the subject property to an already strained creek and drainage basin *can only add* to the public need to manage the stream channel and floodplain for drainage purposes.' " (*Id.* at p. __ [129 L.Ed.2d at p. 313, 114 S.Ct. at p. 2315], italics added.) The Oregon state courts upheld the city's permit conditions, rejecting Mrs. Dolan's argument that the dedication requirements were an uncompensated taking of her property because they were not sufficiently related to her proposed development project.

The United States Supreme Court reversed, establishing in its opinion a two-step procedure for analyzing so-called regulatory takings claims that

cannot remotely be described as a 'governmental benefit.' " (483 U.S. at pp. 833-834, fn. 2 [97 L.Ed.2d at p. 687].)

builds on the holding in *Nollan, supra*, 483 U.S. 825. First, as it had explained in *Nollan*, a court confronted with a property owner's claim that conditions imposed by a local government for issuance of a development permit must "determine whether the 'essential nexus' exists between the 'legitimate state interest' and the permit condition exacted by the city." (*Dolan, supra*, 512 U.S. at p. __ [129 L.Ed.2d at p. 317, 114 S.Ct. at p. 2317], quoting *Nollan, supra*, 483 U.S. at p. 837 [97 L.Ed.2d at p. 689.) If the court finds the presence of such a nexus, it "must then decide the required *degree* of connection between the exactions and the projected impact of the proposed development." (*Id.* at p. __ [129 L.Ed.2d at p. 317], italics added.)

In elaborating upon this latter requirement—one that had not appeared in the formulation adopted by the court in *Nollan*—the Chief Justice's opinion observed that *state* courts "have been dealing with this problem a good deal longer than we have" and typically apply one of three standards. (512 U.S. at p. __ [129 L.Ed.2d at p. 319, 114 S.Ct. at p. 2318].) "In some States," the court noted, "very generalized statements as to the necessary connections between the required dedication and the proposed development seem to suffice." (*Ibid.*) The high court rejected this "deferential" standard as "too lax" to adequately protect a landowner's right to just compensation if her property is taken for a public purpose. (*Dolan, supra*, 512 U.S. at p. __ [129 L.Ed.2d at pp. 319-320, 114 S.Ct. at p. 2319].)

Other state courts have required a very strict correspondence between the exaction and the development, described as the "specifically and uniquely attributable test." Under this standard, the local government must demonstrate that the exaction is precisely proportional to a burden directly and specifically created by the development; otherwise, the regulation becomes, in the words of the Illinois Supreme Court, "a veiled exercise of the power of eminent domain and a confiscation of private property behind the defense of police regulations." (*Pioneer Trust & S. Bank* v. *Village of Mount Prospect* (1961) 22 Ill.2d 375 [176 N.E.2d 799, 802].) The high court also rejected this test as one requiring a more exacting standard of scrutiny than the federal Constitution demands. (*Dolan, supra*, 512 U.S. at p. __ [129 L.Ed.2d at pp. 319-320, 114 S.Ct. at p. 2319].)

Still other states have adopted what the *Dolan* court characterized as an "intermediate position," requiring the municipality to show a "reasonable relationship" between the required exaction and the impact of the proposed development. Typical of these, according to the court, is *Simpson* v. *City of North Platte* (1980) 206 Neb. 240 [292 N.W.2d 297], in which the Nebraska Supreme Court observed that the distinction between a proper exercise of the

police power and an improper exercise of eminent domain turned on whether there was "some reasonable relationship or nexus to the use to which the property is being made or is merely being *used as an excuse for taking property simply because at that particular moment the landowner is asking the city for some license or permit.*" (*Id.* at p. 301, italics added.) A city may not, the Nebraska high court held, impose an exaction for some future public use as a condition of permit approval when such future use is not "*occasioned* by the construction sought to be permitted." (*Id.* at p. 302, italics added.)

The *Dolan* court concluded that the "reasonable relationship" test was the closest to the federal constitutional norm; it declined, however, to adopt the "reasonable relationship" terminology because of the potential for confusion with the *less stringent* "rational basis" standard describing "the minimal level of scrutiny under the Equal Protection Clause of the Fourteenth Amendment." (512 U.S. at p. __ [129 L.Ed.2d at p. 320, 114 S.Ct. at p. 2319].) Instead, the court adopted the term "rough proportionality," explaining that such a formulation entails "some sort of individualized determination that the required dedication is related *both in nature and extent* to the impact of the proposed development." (*Id.* at p. __ [129 L.Ed.2d at p. 320, 114 S.Ct. at pp. 2319-2320], italics added, fn. omitted.) Although, as the court explained, no "precise mathematical calculation is required," the city must nevertheless "make some effort to quantify its findings in support of the dedication" beyond mere conclusory statements that it will mitigate or offset some anticipated burden created by the project. (*Id.* at p. __ [129 L.Ed.2d at p. 323, 114 S.Ct. at p. 2322].)

Applying these principles to the facts before it, the *Dolan* court concluded that the city's required dedications to its "Greenway" system and the pedestrian pathway were not "reasonably related" to Mrs. Dolan's proposed development project. Chief Justice Rehnquist's opinion for the majority conceded that keeping portions of the floodplain adjacent to the petitioner's property free of development could *logically* mitigate pressures on the city's sewage system. However, the court observed, "the city demanded more—it not only wanted petitioner not to build in the floodplain, but it also wanted petitioner's property along [the] Creek for its Greenway system." (512 U.S. at p. __ [129 L.Ed.2d at p. 321, 114 S.Ct. at p. 2320].) Yet nothing in the city's findings explained "why a *public* greenway, as opposed to a private one, was required in the interest of flood control." (*Ibid.*, italics added.) The court thus found it "difficult to see" how public access to petitioner's floodplain easement was "sufficiently related to the city's [admittedly] legitimate interest in reducing flooding problems along [the] Creek, and the city has not attempted to make any individualized determination to support this part of its request." (*Id.* at p. __ [129 L.Ed.2d at p. 321, 114 S.Ct. at pp.

2320-2321].) Hence, the court held, "the findings upon which the city relies do not show the required reasonable relationship between the floodplain easement and the petitioner's proposed new building." (*Id.* at p. ___ [129 L.Ed.2d at p. 322, 114 S.Ct. at p. 2321].)

As for the proposed pedestrian pathway dedication, the court likewise acknowledged that the property owner's development might lead to increased traffic in the downtown streets. Nevertheless, it concluded the city had not demonstrated that the additional traffic generated by the development "reasonably relate[s] to the city's requirement for a dedication of the pedestrian /bicycle pathway easement." (512 U.S. at p. ___ [129 L.Ed.2d at p. 323, 114 S.Ct. at p. 2321.) The city had merely found that the creation of the pathway " '*could* offset some of the traffic demand . . . and lessen the increase in traffic congestion.' " (*Id.* at pp. ___-___ [129 L.Ed.2d at p. 323, 114 S.Ct. at pp. 2321-2322], italics added, fn. omitted.) The fact that the pathway "could" have had such an effect, however, was insufficiently precise to demonstrate the constitutionally required relationship between the development and the compelled property dedication. "[T]he city must make some effort to quantify its findings in support of the dedication for the pedestrian/ bicycle pathway," the court wrote, "beyond the conclusory statement that it could offset some of the traffic demand generated." (*Id.* at p. ___ [129 L.Ed.2d at p. 323, 114 S.Ct. at p. 2322].) Concluding that "the findings upon which the city relies do not show the required reasonable relationship," the court ordered the case remanded for further proceedings. (*Id.* at pp. ___, ___ [129 L.Ed.2d at p. 322, 114 S.Ct. at pp. 2321, 2322].)

IV

*Do Nollan and Dolan Apply to Nonpossessory Exactions?*

Both *Nollan* and *Dolan* involved regulatory schemes under which the local government had required the *possessory dedication* of real property by the owner as a condition for issuing the necessary development permit. Moreover, language employed by Justice Scalia in his opinion for the majority in *Nollan* has been read by some students of the high court's contemporary takings jurisprudence as *limiting* the operation of the "essential nexus" requirement to cases of possessory exactions. After observing that the high court's modern takings cases had upheld land-use restrictions that "substantially advance" a legitimate state purpose (see, e.g., *Agins* v. *Tiburon* (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138]), Justice Scalia wrote that "We are inclined to be particularly careful about the adjective [i.e., '*substantial*'] where the *actual conveyance* of property is made a condition for the lifting of a land use restriction, since in that context there is heightened risk

that the purpose is avoidance of the compensation requirement, rather than the stated police-power objective." (483 U.S. at p. 841 [97 L.Ed.2d at p. 692], italics added.)

This case, of course, does not involve a demand by Culver City that the property owner convey a portion of the parcel for public use as a condition of granting his rezoning request and issuing a permit to build the desired condominium project. Rather, the city insists on a *different* kind of exaction as a condition for authorizing development: the payment of $280,000. Does this distinction in the nature of the exaction make the diptych of *Nollan* and *Dolan* inapplicable to this case? Some courts and commentators have concluded that it does.

In *Blue Jeans Equities West* v. *City and County of San Francisco* (1992) 3 Cal.App.4th 164 [4 Cal.Rptr.2d 114], for example, our Court of Appeal concluded that "any heightened scrutiny test contained in *Nollan* is limited to possessory rather than regulatory takings cases." (*Id.* at p. 171.) The Court of Appeal relied in part on the opinion by the United States Court of Appeals for the Ninth Circuit in *Commercial Builders* v. *Sacramento* (9th Cir. 1991) 941 F.2d 872. There, a divided court had rejected a contention by commercial developers challenging a city ordinance conditioning nonresidential building permits on payment of a fee to offset municipal burdens associated with the influx of low-income workers relocating to fill jobs created by such projects, that *Nollan* imposed a heightened level of scrutiny on such fee exactions. Relying on other federal appellate court opinions that had "considered the constitutionality of ordinances that placed burdens on land use after *Nollan*," the majority concluded that "[n]one have interpreted that case as changing the level of scrutiny to be applied to regulations that do not constitute a physical encroachment on land." (*Id.* at p. 874, citing *St. Bartholomew's Church* v. *City of New York* (2d Cir. 1990) 914 F.2d 348, 357, fn. 6, cert. den. *sub nom. Committee to Oppose Sale of St. Bartholomew's Church* v. *Rector* (1991) 499 U.S. 905 [113 L.Ed.2d 214, 111 S.Ct. 1103]; *Adolph* v. *Federal Emergency Management Agency* (5th Cir. 1988) 854 F.2d 732, 737; *Naegele Outdoor Advertising, Inc.* v. *City of Durham* (4th Cir. 1988) 844 F.2d 172, 178; see also *Leroy Land Dev.* v. *Tahoe Regional Planning Agency* (9th Cir. 1991) 939 F.2d 696.) "As a threshold matter," the Ninth Circuit concluded, "we are not persuaded that *Nollan* materially changes the level of scrutiny we must apply" to the Sacramento ordinance at issue. (941 F.2d at p. 874; see also Kushner, *Property and Mysticism: The Legality of Exactions as a Condition for Public Development Approval in the Time of the Rehnquist Court, supra,* 8 J. Land Use & Envtl. L. 53, 166.)

There is no question that the takings clause is specially protective of property against *physical occupation* or invasion—a proposition that the

court's opinion in *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164] makes clear. It is also true, as the city points out, that government generally has greater leeway with respect to noninvasive forms of land-use regulation, where the courts have for the most part given greater deference to its power to impose broadly applicable fees, whether in the form of taxes, assessments, user or development fees. Both *Blue Jean Equities West* v. *City and County of San Francisco*, *supra*, 3 Cal.App.4th 164, and *Commercial Builders* v. *Sacramento*, *supra*, 941 F.2d 872, dealt with such legislatively formulated development assessments imposed on a broad class of property owners. Fees of this nature may indeed be subject to a lesser standard of judicial scrutiny than that formulated by the court in *Nollan* and *Dolan* because the heightened risk of the "extortionate" use of the police power to exact unconstitutional conditions is not present. Nonetheless, we reject the proposition that *Nollan* and *Dolan* are entirely without application to monetary exactions. When such exactions are imposed—as in this case—neither generally nor ministerially, but on an individual and discretionary basis, we conclude that the heightened standard of judicial scrutiny of *Nollan* and *Dolan* is triggered.

One of the central promises of the takings clause is that truly public burdens will be publicly borne. Where the regulatory land-use power of local government is deployed against individual property owners through the use of conditional permit exactions, the *Nollan* test helps to secure that promise by assuring that the monopoly power over development permits is not illegitimately exploited by imposing conditions that lack any logical affinity to the public impact of a particular land use. The essential nexus test is, in short, a "means-ends" equation, intended to limit the government's bargaining mobility in imposing permit conditions on individual property owners— whether they consist of possessory dedications or the exaction of cash payments—that, because they appear to lack any evident connection to the public impact of the proposed land use, *may* conceal an illegitimate demand—may, in other words, amount to " 'out-and-out . . . extortion.' " (*Nollan*, *supra*, 483 U.S. at p. 837 [97 L.Ed.2d at p. 689].)

Under this view of the constitutional role of the consolidated "essential nexus" and "rough proportionality" tests, it matters little whether the local land use permit authority demands the actual *conveyance* of property or the *payment* of a monetary exaction. In a context in which the contraints imposed by legislative and political processes are absent or substantially reduced, the risk of too elastic or diluted a takings standard—the vice of distributive injustice in the allocation of civic costs—is heightened in either case. Support for this view of the scope of the test can be drawn from a close reading of the text of Justice Scalia's opinion in *Nollan* and from the Chief Justice's opinion in *Dolan*.

## A

The *Nollan* opinion begins its substantive analysis of the takings claim with the proposition that "[h]ad California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach . . . we have no doubt there would have been a taking." (483 U.S. at p. 831 [97 L.Ed.2d at p. 685].) Assuming the state's unilateral and uncompensated requisition of a lateral easement from the Nollans would have offended the takings clause, the court then asked "whether requiring [an easement] to be conveyed as a condition for issuing a land-use permit alters the outcome." (*Id.* at p. 834 [97 L.Ed.2d at p. 687].) The answer to that question, the court said, was "yes." The imposition of a permit condition that "serves the same legitimate police-power purposes as a refusal to issue the permit," the high court reasoned, "should not be found to be a taking *if the refusal to issue the permit would not constitute a taking.*" (*Id.* at p. 836 [97 L.Ed.2d at p. 689], italics added.) "Thus, if the Commission attached to the permit some condition that would have protected the public's ability to see the beach notwithstanding construction of the new house . . . so long as the Commission could have exercised its police power . . . to forbid construction of the house altogether, imposition of the condition would also be constitutional." (*Ibid.*)

The heart of the takings analysis, Justice Scalia's opinion continued, lay in the presence (or absence) of a *link* between the commission's power to deny the Nollans a development permit altogether, and its power to impose a condition on its issuance that furthers the *same end* as an outright prohibition on development. "If a prohibition designed to accomplish that purpose would be a legitimate exercise of the police power rather than a taking, it would be strange to conclude that providing the owner an alternative to that prohibition *which accomplishes the same purpose is not.*" (483 U.S. at pp. 836-837 [97 L.Ed.2d at p. 689], italics added.)

The vice of the commission's permit condition in *Nollan*, however, was the *absence* of any logical connection between the condition and the purported justification for an outright ban on development. "The evident constitutional propriety"—between denying a permit and conditioning its issuance on achieving the same purpose through alternative means—"disappears," the court wrote, "if the condition substituted for the prohibition utterly *fails to further the end advanced as the justification for the prohibition.* When that essential nexus is eliminated, the situation becomes the same as if California law forbade shouting fire in a crowed theater, but granted dispensations to those willing to contribute $100 to the state treasury. . . [T]he lack of nexus between the condition and the original

purpose of the building restriction converts that purpose to something other than what it was. The purpose then becomes, quite simply, the obtaining of an easement to serve some valid governmental purpose, but without payment of compensation." (483 U.S. at p. 837 [97 L.Ed.2d at p. 689], italics added.)

"In short," Justice Scalia concluded, "unless the permit condition *serves the same governmental purpose* as the development ban, the building restriction is not a valid regulation of land use but 'an out-and-out plan of extortion.'" (483 U.S. at p. 837 [97 L.Ed.2d at p. 689], quoting *J.E.D. Associates* v. *Town of Atkinson* (1981) 121 N.H. 581 [432 A.2d 12, 14-15], italics added.)[8]

In briefing before this court, plaintiff and several supporting amici curiae insist that because the club was a *privately* operated facility, accessible only by dues-paying members, a zoning change withdrawing the parcel from such private recreational use could not have a cognizable *public* impact as a matter of law. The trial court, in its memorandum opinion granting judgment for plaintiff, adopted this argument, reasoning that "[plaintiff's] club . . . was at all times *private* property; the city never owned any interest in it nor was any part of it ever dedicated to *public* use. . . . [Plaintiff's] actions cannot be said to deprive the *City* of tennis courts, because neither did [plaintiff] have an affirmative duty to provide tennis courts to the City or its residents nor would tennis courts necessarily be available to the City but for [plaintiff's] project. . . . [¶] The City could have condemned a portion of [plaintiff's] property for use as City tennis courts, but the City would then of course have had to pay for the land. Here, instead of taking land for which it would have had to pay, the City proposes to take not land but money. This is equally impermissible."

The assumption that, because property is designated for private recreational use, it lacks public value and that its subsequent withdrawal has no

---

[8]Justice Scalia, the author of the majority opinion in *Nollan, supra,* 483 U.S. 825, elaborated on his view of the essence of the takings clause in his dissent in *Pennell* v. *San Jose* (1988) 485 U.S. 1, 15 [99 L.Ed.2d 1, 17, 108 S.Ct. 849], a case challenging a rent control ordinance on the ground that one of its criteria for increases—whether a proposed hike would work a hardship to a tenant—constituted an uncompensated taking. Although a majority held the takings claim premature, Justice Scalia would have held "that the . . . provision . . . effects a taking of private property without just compensation . . . ." (*Ibid.*) Invoking the language of *Armstrong* v. *United States* (1960) 364 U.S. 40, 49 [4 L.Ed.2d 1554, 1561, 80 S.Ct. 1563], his dissent reasoned that "[t]raditional land-use regulation . . . does not violate" the principle embodied in *Armstrong* "because there is a cause-and-effect relationship between the property use restricted by the regulation and the social evil that the regulation seeks to remedy." (485 U.S. at p. 20 [99 L.Ed.2d at p. 19] (dis. opn. of Scalia, J.).) The essence of the takings clause, the dissent reasoned, "is simply the unfairness of making one citizen pay, in some fashion other than taxes, to remedy a social problem that is none of his creation." (*Id.* at p. 23 [99 L.Ed.2d at p. 22]; cf. *Nollan, supra,* 483 U.S. at p. 825, fn. 4 [97 L.Ed.2d at p. 688].)

public impact is flawed as a matter of logic. Although privately owned and operated, plaintiff's health club was a business establishment, accessible to the public on the payment of a membership fee. The opportunity of Culver City residents to use such private recreational facilities created a *public* benefit by enlarging the availability of such facilities. Without such a facility, residents would have to travel farther, wait longer, and put up with other inconveniences and restricted choices in their recreational pursuits. Thus, the fact that a recreational facility is privately rather than publicly owned does not erase its value to the public.

This principle—that the discontinuation of a private land use may have distinctly *public* consequences—is well accepted in land-use law. Indeed, in *Nollan* itself Justice Scalia as much as conceded that the loss of private open space resulting from residential beach development could lead to an adverse public impact—a diminution of coastal views—justifying a requirement that the Nollans "provide a viewing spot on their property for passersby with whose sighting of the ocean their new house would interfere." (483 U.S at p. 836 [97 L.Ed.2d at p. 689].) Although, as we explain below, the fact that a recreational facility is privately rather than publicly owned may affect the magnitude of the value the city may constitutionally place on its loss, private status alone does not per se erase its intrinsic public value for land-use regulatory purposes. In short, it is well accepted in both the case and statutory law that the discontinuance of a private land use can have a significant impact justifying a monetary exaction to alleviate it. We perceive no reason why the same cannot be said of the loss of land devoted to private recreational use through its withdrawal from such a use as a result of being "up zoned" to accommodate incompatible uses.

There thus exists a potential basis *in logic* for a connection between a social need generated by plaintiff's condominium project and the $280,000 mitigation fee imposed by the city.

## B

The opinion by the Chief Justice in *Dolan, supra,* 512 U.S. 374, both incorporates the essential nexus test of *Nollan,* and takes the next analytical step—determining the extent to which the takings clause imposes not only a logical connection between a permit condition and the public impact of a given land use, but dictates the nature of the required "fit" between means and ends. While the court in *Nollan* was concerned with the *nature* of the relationship between a proposed development and a governmental exaction, its focus in *Dolan* is on the *degree* of the required connection. Instead of asking "what is the nature of the relationship between a given permit

condition and the public costs of a proposed land use" (a question answered in *Nollan* by the "essential nexus" formulation), the court asked in *Dolan* "[W]hat is the required *degree of connection* between the exactions imposed by the city and the projected impact[] of the proposed development?" (*Id.* at p. __ [129 L.Ed.2d at p. 311, 114 S.Ct. at p. 2312], italics added.)

The answer to that question, as we have seen, is twofold. The condition imposed by the challenged regulation must not only be roughly proportional, the *Dolan* court held, both in "nature and extent to the impact of the proposed development" (512 U.S. at p. __ [129 L.Ed.2d at p. 320, 114 S.Ct. at p. 2320]), but the required proportionality must be demonstrated by "some sort of individualized determination." (*Id.* at p. __ [129 L.Ed.2d at p. 320, 114 S.Ct. at p. 2319].) The court framed the first leg of its rough proportionality test as an inquiry into "whether the degree of the exactions demanded by the city's permit conditions bear the required relationship to the projected impact of petitioner's proposed development." (*Id.* at p. __ [129 L.Ed.2d at p. 318, 114 S.Ct. at p. 2318].) The antecedent question underlying *that* inquiry is, of course, the exact nature of the "required relationship" imposed by the takings clause. As we have seen, the court answered its own question by applying an "intermediate" level of constitutional scrutiny— "rough proportionality"—to the relationship between the city's permit conditions and the public costs associated with Mrs. Dolan's proposed development.

We need not repeat here the extended account of the *Dolan* court's reasoning set out above (*ante*, at pp. 869-872), except to note that, as we read the high court's opinion, the chief analytical advance of *Dolan* over the formulation by the court in *Nollan* appears to lie in the requirement that the local permit authority "make some sort of *individualized* determination that the required dedication is related both in nature and extent to the impact of the proposed development." (512 U.S. at pp. __-__ [129 L.Ed.2d at p. 320, 114 S.Ct. at pp. 2319-2320], italics added, fn. omitted.) We view the requirement that the local government demonstrate a *factually* sustainable proportionality between the effects of a proposed land use and a given exaction as one which furthers the assurances implicit in the *Nollan* test that the condition at issue is more than theoretically or even plausibly related to legitimate regulatory ends.

*Nollan* and *Dolan* are thus concerned with implementing one of the fundamental principles of modern takings jurisprudence—"to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." (*Armstrong*

v. *United States, supra,* 364 U.S at p. 49 [4 L.Ed.2d at p. 1561].) Of course, as we have already observed, it is not at all clear that the rationale (and the heightened standard of scrutiny) of *Nollan* and *Dolan* applies to cases in which the exaction takes the form of a *generally* applicable development fee or assessment—cases in which the courts have deferred to legislative and political processes to formulate "public program[s] adjusting the benefits and burdens of economic life to promote the common good." (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 648, 98 S.Ct. 2646].) But when a local government imposes special, discretionary permit conditions on development by individual property owners —as in the case of the recreational fee at issue in this case—*Nollan* and *Dolan* require that such conditions, whether they consist of possessory dedications or monetary exactions, be scrutinized under the heightened standard.

V

*Applying the Heightened Standard in This Case*

 We come, then, to the application of the combined *Nollan-Dolan* "essential nexus" and "rough proportionality" test to the facts in the record before us. Like the high court in *Dolan, supra,* 512 U.S. 374, we will conclude that, although the city's findings with respect to the relationship between the monetary exaction and the withdrawal of a parcel of land within Culver City restrictively zoned for private recreational use satisfies the essential nexus standard, the present record is inadequate to support the requirement that plaintiff pay a recreational fee of $280,000 for the desired permit. We conclude instead that although the city may be able to justify a monetary exaction in *some* amount, what that figure is we are quite unable to say on this record.

A

The land-use limitation on which the city relies to justify its $280,000 fee exaction consists of a restriction of plaintiff's use of his property to commercial recreational activities, a restriction that could not be changed without amending both Culver City's general plan and the specific plan applicable to the parcel. It is well settled that such a limitation on use is constitutional unless the restriction "does not substantially advance legitimate state interests . . . or denies an owner economically viable use of his land." (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 260 [65 L.Ed.2d at p. 112].)

 The general purpose of zoning and planning is to regulate the use of land to promote the public welfare, a power the courts have construed very

broadly. Indeed, one of the traditional uses of the police power lies in providing citizens adequate recreational opportunities. (See, e.g., *Associated Home Builders*, *supra*, 4 Cal.3d 633, 638 ["The elimination of open space in California is a melancholy aspect of the unprecedented population increase which has characterized our state in the last few decades. . . . [G]overnmental entities have the responsibility to provide park and recreation land to accommodate this human expansion . . . ."].) ■■■ We thus have no doubt that the use of zoning to facilitate the availability of private recreational facilities to the residents of Culver City is within the scope of the city's police power.

■■■ Nor is it an unreasonable use of the police power for the city to prescribe not only broad categories of land use, such as "commercial" and "residential," but to specify, through a general plan, specific plan, and zoning regulations, the types of businesses that can be carried on at a given site, so long, of course, as the restrictions meet the two-part standard embodied in *Agins* v. *City of Tiburon*, *supra*, 447 U.S. 255. ■■■ The record before us indicates that private recreational facilities were in scarce supply in the city and merited preservation and promotion. As the 1988 city staff analysis of plaintiff's proposed project noted, "Culver City as a fully-developed urban city has very little open space in which to develop parks and related recreational facilities. By national standards . . . the City is deficient in park space, tennis courts, swimming facilities, gymnasiums and the recreational activity centers needed to maintain and enhance the 'quality of life' in our community."

We thus have no doubt as to the city's legitimate authority to impose development impact fees for park and recreational purposes. (See *Associated Home Builders*, *supra*, 4 Cal.3d 633; Gov. Code, §§ 66001, 66477.) Nor is there any genuine dispute that the $280,000 fee, which the city has committed to the purchase of additional recreational facilities, will substantially advance its legitimate interest in correcting a demonstrated deficiency in municipal recreational resources. Unlike *Nollan*, where the high court found no logical connection between the commission's demand for a lateral easement across the owner's property and the purported governmental purpose of enhancing visual access, the "essential nexus" in this case is plain.

B

We must next decide whether there is a "rough proportionality" between the public impact of the land use change and the recreational fee. The *Dolan* court, in an effort to balance the government's legitimate need to impose reasonable exactions against the property owner's right to be free of undue

burdens, formulated an intermediate standard of review and a corresponding evidentiary burden on local government. "[G]eneralized statements as to the necessary connection between the required dedication and the proposed development" are constitutionally insufficient, according to the court. (512 U.S. at p. __ [129 L.Ed.2d at p. 319, 114 S.Ct. at p. 2318].) As noted, however, the *Dolan* majority also rejected the claim that the government "demonstrate that its exaction is directly proportional to the specifically created need" as being more than the Fifth Amendment demands. (*Id.* at p. __ [129 L.Ed.2d at p. 319, 114 S.Ct. at p. 2319].)

In both *Nollan* and *Dolan*, the court conceded that the development project at issue would have negative effects that the city could mitigate using its police power. It found insufficiently substantial, however, the connection between those effects and the required public dedications. Similarly, the record before us in this case is devoid of any individualized findings to support the required "fit" between the monetary exaction and the loss of a parcel zoned for commercial recreational use. The city argues that its $280,000 recreation fee is warranted as partial compensation for the loss of some $800,000 in recreational improvements that were formerly located on plaintiff's property. But in this case it is error to measure the lost recreational benefits by the lost value of plaintiff's health club. The loss which the city seeks to mitigate by levying the contested recreational fee is not the loss of any particular recreational facility, but the loss of property reserved for private recreational use.

The city appears to be arguing, implicitly, that if it had refused to change its general and specific plan designations, and insisted on a private recreational use of the land, a new recreational facility would have been resurrected on the site, one containing four tennis court or their equivalent. From this premise, the city asserts that the change in land use granted plaintiff has resulted in the "loss" of four tennis courts that would have been built had that land-use change not been granted. Even if such a supposition could be proven, however, it would still not justify the $280,000 fee, because the cost of these new private tennis courts would have been paid for by the fees of the private club members and the courts would have been private, not open to all members of the public free of charge.

Thus, under the city's formula, the public would receive, ex gratia, $280,000 worth of recreational facilities the cost of which it would otherwise have to finance through membership fees. Plaintiff is being asked to pay for something that should be paid for either by the public as a whole, or by a private entrepreneur in business for a profit. The city may not constitutionally measure the magnitude of its loss, or of the recreational exaction, by the value of facilities it had no right to appropriate without payment.

This is not to say, however, that *some* type of recreational fee imposed by the city as a condition of the zoning and related changes cannot be justified. The amount of such a fee, however, must be tied more closely to the actual impact of the land-use change the city granted plaintiff. Although we are unable to discern, on this record, the precise value or the economic cost of these impacts, several possibilities suggest themselves. One such possibility is likely to be the additional administrative expenses incurred in redesignating other property within Culver City for recreational use. The city's director of human services, who opposed the abandonment of a recreational use restriction on plaintiff's property, stated that to "permit this type of recreational development elsewhere would . . . involve arduous and costly rezoning and public hearings." It would be reasonable to require plaintiff to contribute toward defraying these anticipated rezoning costs, so that the city does not have to bear them itself or pass them along to future private developers seeking to construct recreational facilities.

More generally, the city's approval of plaintiff's condominium project may have given rise to public costs in the form of a diminished ability to attract private recreational development. If the city can show that it would have to incur greater costs to attract a developer of suitable private recreational facilities because plaintiff's parcel is no longer reserved for such a recreational use, it may consider these costs to be a part of the impact of plaintiff's project, and would be constitutionally permitted to impose such an exaction. Such a fee would enable the city to induce private health club development by offering monetary incentives roughly proportional to the land use incentive it relinquished when it removed the recreational use restriction from plaintiff's property.

Of course, the city could not constitutionally require plaintiff to dedicate the same amount of land for *public* recreational facilities. It could, however, require plaintiff to transfer, so to speak, the restricted land-use designation at the Overland Avenue site to a comparable parcel plaintiff owns within the city, thus returning the city to the status quo as it existed prior to approval of the condominium project, that is, with a similar parcel of vacant land reserved for recreational use as an inducement to the development of private recreational facilities. If the city decides, however, that such a restricted land-use transfer is impracticable, it may surely levy an in-lieu exaction to accomplish the same objective. Such a fee would serve the same purpose as do all development fees: providing the city with a means of escaping the narrow choice between denying plaintiff his project permit altogether or subordinating legitimate public interests to plaintiff's development plans.

We cannot say, on this incomplete record, what, if any, recreational fee the evidence might justify. Although in calculating its net cost as a result of

upzoning the Overland Avenue parcel the city must take into account any relative benefit that plaintiff's project would contribute to the public interest for which the fee is imposed, the record suggests that some exaction may be warranted. It is thus appropriate to return the case to the city to reconsider its valuation of the fee in light of the principles we have articulated. Remand to the city was apparently what occurred in *Dolan* itself after the case was returned to the Oregon Supreme Court. (See *Dolan* v. *City of Tigard* (1994) 319 Or. 567 [877 P.2d 1201] [the case is "remanded to the City of Tigard for further proceedings."].) Following remand, the city must determine whether and to what extent approval of plaintiff's requested land-use changes justify the imposition of a recreation fee as a means of compensating it for the additional costs of attracting the development of comparable private recreational facilities for its residents. The determination of such a fee will, of course, require the city to make specific findings supported by substantial evidence—that is, the city "must make some effort to quantify its findings" supporting any fee, beyond "conclusory statements," although "[n]o precise mathematical calculation is required" either by the takings clause or the Act. (*Dolan, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 323, 114 S.Ct. at p. 2322].)

VI

*The Art in Public Places Fee*

Under the city's art in public places ordinance, plaintiff could not receive a certificate of occupancy for any of the 30 townhouses in the project until he either paid $32,200 to the city art fund (1 percent of the total building valuation) or contributed an approved work of art of an equivalent value. Under the latter option, the art may either be placed on site, in which case it remains the property of the applicant, or it may be donated to the city for placement elsewhere. Although petitioner initially opted to pay the fee, his successor in interest subsequently placed art of his own choosing on the site and received the 30 certificates of occupancy during the pendency of this action.

Plaintiff contends that the required dedication of art or the cash equivalent thereof constitutes a taking under the *Nollan-Dolan* standards. This follows, he asserts, from the fact that the city made no individualized determination that the art mitigates a need generated by the project.

The city defends the art fee on several grounds. As a threshold matter, it contends plaintiff failed to preserve his right to litigate the claim because his successor satisfied the requirements of the ordinance and accepted the

benefit of receiving all 30 certificates of occupancy during the pendency of these proceedings. The record shows, however, that plaintiff filed a written protest to the imposition of the fee in accordance with Government Code section 66020, and subsequently entered into an agreement with the city in which he preserved his right to maintain this "lawsuit" challenging both the recreation fee and the art fee. Thus, the claim has not been waived.

Nevertheless, we agree with the city that the art in public places fee is not a development exaction of the kind subject to the *Nollan-Dolan* takings analysis. As both the trial court and the Court of Appeal concluded, the requirement to provide either art or a cash equivalent thereof is more akin to traditional land-use regulations imposing minimal building setbacks, parking and lighting conditions, landscaping requirements, and other *design* conditions such as color schemes, building materials and architectural amenities. Such aesthetic conditions have long been held to be valid exercises of the city's traditional police power, and do not amount to a taking merely because they might incidentally restrict a use, diminish the value, or impose a cost in connection with the property. (See, e.g., *Metromedia Inc.* v. *San Diego* (1980) 453 U.S. 490, 508, fn. 13 [69 L.Ed.2d 800, 815, 101 S.Ct. 2882] [approving prohibition against outdoor advertising]; *Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. 104 [upholding municipal power to preserve landmark structures]; *Agins* v. *Tiburon, supra,* 447 U.S. 255 [upholding condition to preserve scenic views].) The requirement of providing art in an area of the project reasonably accessible to the public is, like other design and landscaping requirements, a kind of aesthetic control well within the authority of the city to impose.

## CONCLUSION

A generation ago, an observer of the high court's takings jurisprudence called the question of when land-use regulation under the police power becomes compensable "the most haunting jurisprudential problem in the field of contemporary land-use law." (Harr, Land-Use Planning (3d ed. 1977) 766, quoted in *The Supreme Court—Leading Cases, supra,* 101 Harv. L. Rev. 119, 241.) After more than half a century during which the content of the takings clause lay comparatively unexamined—roughly between *Pennsylvania Coal* v. *Mahon* (1922) 260 U.S. 393 [67 L.Ed. 322, 43 S.Ct. 158, 28 A.L.R. 1321], and *Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. 104—the high court decided no less than eight such cases in a little more than a decade.[9] As several commentators have observed, the task of making this blitz of opinions doctrinally coherent is daunting; even the

[9]*Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. 104; *Agins* v. *Tiburon, supra,* 447 U.S. 255; *Loretto* v. *Teleprompter Manhattan CATV Corp., supra,* 458 U.S. 419; *Keystone*

short-term direction of the court's recent takings jurisprudence remains uncertain. Perhaps *Nollan* and *Dolan* mark, as some scholars have suggested, "a major shift of the power of government in land use cases." (Epstein, *Takings: Descent and Resurrection, supra,* 1987 Sup. Ct. Rev. 1, 43); perhaps, as others have argued, they represent "a step backwards" from the heightened protection of property rights. (Note, *Taking a Step Back: A Reconsideration of the Takings Test of Nollan v. California Coastal Commission, supra,* 102 Harv. L. Rev. 448, 468.) Our own reading lies somewhere between these two margins.

The judgment of the Court of Appeal is reversed; the cause is remanded to that court with directions to order the case returned to the City of Culver City.

Lucas, C. J., and George, J., concurred.

MOSK, J., ██ ██ ██ ██ I concur in the plurality's judgment, and agree with much of its analysis. I fully agree with part V of the plurality opinion—that Culver City (the City) may be able to charge a fee for the loss of property designated for recreational use, but that it failed to employ the proper method of calculating such a fee. I agree, too, with part VI of the plurality opinion—that the art fee is constitutional. I write separately to address the larger question of the appropriate constitutional standard for reviewing monetary exactions on development. As I will elaborate below, the heightened standard of scrutiny found in *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] *(Nollan)* and *Dolan* v. *City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309] *(Dolan)* is generally *not* applicable to development fees; the present case is thus more the exception than the rule. This view is consistent with the plurality's analysis, and our difference in this regard is more one of emphasis than of substance.

As explained below, nothing in the United States Supreme Court's recent takings jurisprudence can be understood to signify a change in the rule—founded on the fundamental principles of the separation of powers and judicial restraint—that state and local governments possess considerable authority to impose different and unequal financial burdens on property owners, subject only to the rational basis requirements of the Fourteenth Amendment's equal protection clause. Only when the government engages

---

*Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470, 485 [94 L.Ed.2d 472, 488, 107 S.Ct. 1232]; *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378]; *Nollan, supra,* 483 U.S. 825; *Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015-1016 [120 L.Ed.2d 798, 813-814, 112 S.Ct. 2886, 2893-2894]; *Dolan, supra,* 512 U.S. 374.

in the physical taking or invasion of real and personal property, or singles out individual property owners by conditioning development permits on the payment of ad hoc fees not borne by a larger class of developers or property owners, does the heightened scrutiny of *Nollan* and *Dolan* apply.

## I.

A. *Physical Takings, Regulatory Takings, and the Nollan/Dolan Standard.*

*Nollan* and *Dolan* must be viewed within the general framework of takings jurisprudence. One of the cornerstones of such jurisprudence is the special protection given to the *physical* invasion or occupation of real property under the Fifth Amendment. A government regulation that affects the use of land, such as a zoning ordinance, is generally not deemed to be a taking unless the regulation "does not substantially advance legitimate state interests [citation] or denies an owner economically viable use of his land [citation]." (*Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [65 L.Ed.2d 106, 112, 100 S.Ct. 2138].) In these cases, the burden rests with those challenging the regulation to demonstrate its unconstitutionality. (See *Dolan, supra,* 512 U.S. at p. __, fn. 8 [129 L.Ed.2d at p. 320, 114 S.Ct. at p. 2320].) However, "regulations that compel the property owner to suffer a physical 'invasion,' " will generally be determined to be takings *"no matter how minute the intrusion, and no matter how weighty the public purpose behind it . . . ."* (*Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015 [120 L.Ed.2d 798, 812, 112 S.Ct. 2886, 2892], italics added.)

The centrality of physical invasion in takings jurisprudence is nowhere more clearly stated than in *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164] (*Loretto*). There the court invalidated a New York law requiring owners of apartment buildings to permit cable television companies to install cable wires and boxes on their premises. The court stated that it had "long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause. Our cases further establish that when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred. In such case, 'the character of the government action' not only is an important factor in resolving whether the action works a taking but is also determinative." (*Id.* at p. 426 [73 L.Ed.2d at p. 876].) As the court emphasized, "[a] landowner's right to exclude [is] 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " (*Id.* at p. 433 [73 L.Ed.2d at p. 881].) In a permanent physical occupation of property "the government does not simply take a single

'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand." (*Id.* at p. 435 [73 L.Ed.2d at p. 882].) The court therefore found the cable statute to be unconstitutional because of its requirement that landlords consent to the permanent occupation of their property, although the economic impact of this statute was far less onerous than a number of other regulations upheld by the court that restricted the use of property but did not authorize its physical invasion. (See, e.g., *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104 [57 L.Ed.2d 631, 98 S.Ct. 2646] [denial of permit to build a high rise for the sake of historical preservation]; *Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470 [94 L.Ed.2d 472, 107 S.Ct. 1232] [regulation requiring coal mines to keep 50 percent of coal in the ground in order to prevent subsidence not a taking].)

*Nollan* must be considered as a further development of the principles enunciated in *Loretto*. In *Nollan*, the court considered a government regulation that permitted the physical invasion of property as a condition of granting a development permit. The Nollans sought to replace a dilapidated bungalow on property bordering the ocean, and were required to obtain a coastal development permit. As a condition of the permit, the Nollans would have been compelled to provide lateral public access along a portion of their property bounded by the ocean and their seawall, to enable members of the public to walk between two public beaches bordering the Nollans' property.

The court began its analysis by reaffirming the holding in *Loretto* that "[w]here governmental action results in '[a] permanent physical occupation' of the property, by the government itself or by others [citation], 'our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner . . . .' " (*Nollan, supra,* 483 U.S. at pp. 831-832 [97 L.Ed.2d at p. 686], quoting *Loretto, supra,* 458 U.S. at pp. 434-435 [73 L.Ed.2d at p. 882].) The court continued: "We think a 'permanent physical occupation' has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." (*Nollan, supra,* 483 U.S. at p. 832 [97 L.Ed.2d at p. 686].)

Given that view, it might be expected that the court would hold that the easement in *Nollan*, like the cable statute in *Loretto*, was a per se taking, for which the government must pay no matter what the justification. But the court recognized that the regulation in the case before it, unlike the statute in *Loretto*, was imposed as a condition of approving a development application,

and that a public agency could, if the proposed development contravened a valid land use regulation, deny that application altogether. "If a prohibition [to development] designed to accomplish [a lawful state] purpose would be a legitimate exercise of the police power rather than a taking, it would be strange to conclude that providing the owner an alternative to that prohibition which accomplishes the same purpose is not." (*Nollan, supra,* 483 U.S. at pp. 836-837 [97 L.Ed.2d at p. 689].)

Thus, the otherwise unconstitutional imposition of a public easement on private property derives its constitutional legitimacy from the fact that a prohibition on development is constitutionally justified. "The evident constitutional propriety disappears, however, if the condition substituted for the prohibition utterly fails to further the end advanced as the justification of the prohibition." (*Nollan, supra,* 483 U.S. at p. 837 [97 L.Ed.2d at p. 689].) Without this "essential nexus," between the permit condition and the development ban, "the building restriction is not a valid regulation of land use but 'an out-and-out plan of extortion.'" (*Ibid.*) The *Nollan* court found no such nexus in the case before it. The purported justification for limiting development—the interference of the newly constructed house with a public view of the ocean—was not served by a lateral easement allowing individuals to walk along the ocean. (*Id.* at pp. 838-839 [97 L.Ed.2d at p. 690].)

That the *Nollan* case turned on the fact that the regulation was a physical taking is further accentuated by Justice Scalia at the conclusion of the majority opinion: "We view the Fifth Amendment's Property Clause to be more than a pleading requirement . . . . [O]ur cases describe the condition for abridgment of property rights through the police power as a '*substantial advanc[ing]*' of a legitimate state interest. We are inclined to be particularly careful about the adjective *where the actual conveyance of property* is made a condition to the lifting of a land-use restriction, since in that context there is a heightened risk that the purpose is avoidance of the compensation requirement, rather than the stated police-power objective." (*Nollan, supra,* 483 U.S. at p. 841 [97 L.Ed.2d at p. 692], second italics added.) Thus in *Nollan*, the rule that the government's physical occupation of private property is a per se taking is transformed, in the context of a development application, into a rule of heightened scrutiny to ensure that a required development dedication is not a mere pretext to obtain or otherwise physically invade property without just compensation.

In *Dolan*, the court considered the issue of how close the nexus between the development restriction and the dedication must be. In that case, Dolan sought the expansion of her hardware store. The court conceded that the city had legitimately found that the expansion would affect two valid government

interests. First, the store expansion, adjacent to a floodplain, would increase the risk of flooding by paving over a greater surface area. Second, the expanded store would increase traffic congestion on nearby streets. The court also conceded that there was a nexus between those impacts and the development conditions in question—the dedication of an easement along the floodplain for a public greenway, and the dedication of an additional easement for a bicycle path. (*Dolan, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 313, 114 S.Ct. at p. 2314].) The court found, however, the nexus to be insufficient. There must be a "rough proportionality" between the development impact and the dedication, and a public agency "must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." (*Id.* at pp. __-__ [129 L.Ed.2d at p. 320, 114 S.Ct. at pp. 2319-2320], fn. omitted.)

The *Dolan* court, like the *Nollan* court, reiterated that its holding depended in part on the special protection that the takings clause affords against the physical occupation of private property by the government. The development conditions in *Dolan* "were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she *deed* portions of her property to the city. In *Nollan, supra,* we held that governmental authority to exact such a condition was circumscribed by the Fifth and Fourteenth Amendments. Under the well-settled doctrine of 'unconstitutional conditions' the government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the property sought has little or no relationship to the benefit." (*Dolan, supra,* 512 U.S. at pp. __-__ [129 L.Ed.2d at p. 316, 114 S.Ct. at pp. 2316-2317], italics added.) The *Dolan* court found an additional reason for treating the dedication in question according to a higher standard. Most land-use regulations "involve[] essentially legislative determinations classifying . . . areas of the city, whereas here the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel." (*Id.* at p. __ [129 L.Ed.2d at p. 316, 114 S.Ct. at p. 2316].) The court also made clear that in such cases the burden rests with the city "to justify the required dedication." (*Id.* at p. __, fn. 8 [129 L.Ed.2d at p. 320, 114 S.Ct. at p. 2320].)

Are development fees more like dedications, which will receive a heightened judicial scrutiny, or like zoning and other land-use restrictions, which are reviewed with greater deference? The answer to that question is not simple—to some extent monetary exactions are sui generis. But in one fundamental sense, monetary exactions are more like zoning restrictions: like these restrictions they do not involve a physical invasion of property,

but merely a diminution in its economic value. As such, development fees may be placed in a class not only with such land use regulations, but also with other sorts of economic regulations that may significantly reduce the profit or value derived from property, yet are not deemed to be takings unless the regulations are arbitrary or confiscatory. (See *20th Century Ins. Co.* v. *Garamendi* (1994) 8 Cal.4th 216, 292-297 [32 Cal.Rptr.2d 807, 878 P.2d 566] [rate regulation can only be a taking if confiscatory]; *United States* v. *Sperry Corp.* (1989) 493 U.S. 52, 60 [107 L.Ed.2d 290, 301, 110 S.Ct. 387] [reasonable user fees that reduce the value of arbitration award not a taking].)

It could be argued that the appropriation of a property owner's money, in the form of a development fee, can be considered a "physical invasion" of monetary assets, and therefore as constitutionally objectionable as the physical occupation of real property. The United States Supreme Court has decisively rejected such equivalency. In *United States* v. *Sperry Corp.*, *supra*, 493 U.S. 52 (*Sperry*), a case that will be discussed at greater length below, the court upheld a deduction of a percentage of an award received from the Iran-United States claims tribunal as a reasonable user fee. Plaintiff corporation argued that such a dedication "was akin to a 'permanent physical occupation' of its property and therefore was a per se taking requiring just compensation [citing *Loretto*]." (*Id.* at p. 62, fn. 9 [107 L.Ed.2d at p. 303], italics omitted.) The court responded: "It is artificial to view a deduction of a percentage of a monetary award as physical appropriations of property. Unlike real or personal property, money is fungible. No special constitutional importance attaches to the fact that the Government deducted its charge directly from the award rather than requiring [plaintiff] to pay it separately. If the deduction in this case were a physical occupation requiring just compensation, so would be any fee for services, including a filing fee that must be paid in advance. Such a rule would be an extravagant extension of *Loretto*." (*Ibid.*)

In fact, unlike the physical appropriation of real property, the government "takes" money from property owners in numerous circumstances with typically minimal constitutional constraints, as discussed immediately below.

B. *Constitutional Review of Taxes, Assessments, User Fees, and Other Fees.*

To put the matter simply, the taking of money is different, under the Fifth Amendment, from the taking of real or personal property. The imposition of various monetary exactions—taxes, special assessments, and user fees—has been accorded substantial judicial deference. As elaborated below, many if

not most development fees resemble such exactions in that they are categorically applied to a general class—to all developments or to certain types of development. The imposition of such development fees, like other general fees, has also been given substantial deference. What follows is a brief account of the constitutional standards used for determining the validity of these various types of monetary exactions.

First, government is obviously able, constitutionally, to take money from property owners as part of a valid scheme of taxation. The separation of powers doctrine dictates that courts allow states and their subdivisions considerable flexibility in the imposition of varying tax burdens on different classes of taxpayers. "Of course, the States, in the exercise of their taxing power, are subject to the requirements of the Equal Protection Clause of the Fourteenth Amendment. But that clause imposes no iron rule of equality . . . . [States] may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. [They are] not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value." (*Allied Stores of Ohio* v. *Bowers* (1959) 358 U.S. 522, 526-527 [3 L.Ed.2d 480, 484, 79 S.Ct. 437].) Courts will not invalidate a state taxation scheme unless the classifications used are without "rational basis" and are "palpably arbitrary." (*Id.* at p. 527 [3 L.Ed.2d at p. 485].)

Of particular relevance for the issue of development fees, California courts have upheld on numerous occasions excise taxes that charge fees on new development for purposes of raising general revenue, in which no close "nexus" or "reasonable relationship" is required. (See *Centex Real Estate Corp.* v. *City of Vallejo* (1993) 19 Cal.App.4th 1358 [24 Cal.Rptr.2d 48] [upholding excise tax of $3,000 per unit of residential development and $.30 per square foot of nonresidential development]; *The Pines* v. *City of Santa Monica* (1981) 29 Cal.3d 656 [175 Cal.Rptr. 336, 630 P.2d 521] [upholding $1,000 fee for sale of new or converted condominiums]; *Westfield-Palos Verdes Co.* v. *City of Rancho Palos Verdes* (1977) 73 Cal.App.3d 486 [141 Cal.Rptr. 36] [upholding excise tax of $500 per bedroom, up to a maximum of $1,000 per dwelling unit]; *Associated Home Builders, Inc.* v. *City of Newark* (1971) 18 Cal.App.3d 107 [95 Cal.Rptr. 648] [upholding per-bedroom excise tax].) As the Court of Appeal recently explained in *Centex Real Estate Corp., supra,* 19 Cal.App.4th at page 1364: " '[A]n excise tax is a "tax on the exercise of one of the incidences of property ownership," such as the ability to transfer or devise property or the ability to use, store, or consume it.' " Accordingly, "[a]n excise tax may properly be imposed on the privilege of developing property" as one such incidence of property ownership. (*Ibid.*)

While the takings clause is concerned in part with preventing those whose property has been appropriated or destroyed by government action from "bear[ing] public burdens which, in all fairness and justice, should be borne by the public as a whole" (*Armstrong* v. *United States* (1960) 364 U.S. 40, 49 [4 L.Ed.2d 1554, 1561, 80 S.Ct. 1563]), the equal protection clause generally permits government to impose unequal tax burdens on individuals as long as they are rationally based. There is no indication that *Nollan* and *Dolan* have superseded equal protection doctrine in the realm of taxation, even if the taxes affect the value of property or the profits from development. But if a municipality can constitutionally impose a development tax as long as it is rationally based, why is a higher level of constitutional scrutiny required when, as in the case of generally applicable development fees, the "tax" is earmarked for use in alleviating specific development impacts rather than for the general fund?

Another kind of monetary exaction on property owners which is subject to a fairly deferential standard of judicial review is special assessments. Special assessment districts are established to permit cities and counties to charge groups of property owners for improvements from which they will especially benefit; the individual assessments are to be calculated in proportion to the estimated benefits to the parcels against which they are assessed. (Sts. & Hy. Code, §§ 10203-10204; *Dawson* v. *Town of Los Altos Hills* (1976) 16 Cal.3d 676, 683-684 [129 Cal.Rptr. 97, 547 P.2d 1377] (*Dawson*).) Although no recent California case considers a takings challenge to a special assessment, the case of *Waters* v. *Montgomery County* (1994) 337 Md. 15 [650 A.2d 712] is directly relevant. In that case, Maryland's highest court upheld a "development impact tax" that functioned much like a benefit assessment or excise tax, imposing monetary exactions on all development within certain undeveloped areas of Montgomery County according to a per-residential-unit or per-square-foot measurement, and spending the funds to improve roads and other transportation facilities within these areas. (*Id.* at p. 714.) The court considered an equal protection challenge to the fee, and upheld the fee as an economic regulation with a "rational basis"—it was reasonable to conclude that development in the two areas would lead to a need for increased transportation facilities. (*Id.* at pp. 721-723.) The court also rejected the argument that the takings clause, as interpreted by *Dolan*, requires that such an assessment be subject to greater constitutional scrutiny than the equal protection clause would demand. It concluded that *Dolan* was distinguishable in part because it required that the property owner " 'deed portions of the property to the city.' " (*Id.* at p. 724.) The tax in question neither compelled a physical invasion of the property nor denied " 'all economically

beneficial or productive use of [the] land,' " and was therefore not a taking. (*Ibid.*)[1]

The government is also given broad discretion to charge user fees, and the recent case of *Sperry, supra,* 493 U.S. 52, makes clear that judicial review of such fees under the takings clause is similarly narrow. In that case the court upheld against a takings challenge the deduction of a portion of a judgment awarded to plaintiff corporation from the Iranian government in order to pay for the expenses of the Iran-United States Claims Tribunal, although the corporation claimed not to have proportionately benefited from the tribunal. (*Id.* at pp. 63-64 [107 L.Ed.2d at p. 304].) As the *Sperry* court reaffirmed, "the Just Compensation Clause 'has never been read to require the . . . courts to calculate whether a specific individual has suffered burdens . . . in excess of the benefits received' in determining whether a 'taking' has occurred." (*Id.* at p. 61, fn. 7 [107 L.Ed.2d at p. 302].) In order to withstand a takings challenge, a user fee does not have to be "precisely calibrated to the use that a party makes of Government services. . . . All that we have required is that the user fee be a " 'fair approximation of the cost of benefits supplied.' " (*Id.* at p. 60 [107 L.Ed.2d at p. 301].) The court recognized "that when the Federal Government applies user charges to a large number of parties, it probably will charge a user more or less than it would under a perfect user-fee system, but we [decline] to impose a requirement that the Government 'give weight to every factor affecting appropriate compensation

---

[1]Although there are no recent takings cases in California involving special assessments, a challenge to a special assessment district is typically framed in terms somewhat similar to a takings challenge—that a property owner is being asked to pay for services from which he or she does not specially benefit, and which should be borne by the public as a whole through taxation. (See *Knox* v. *Orland* (1992) 4 Cal.4th 132, 143 [14 Cal.Rptr.2d 159, 841 P.2d 144] [assessment is challenged as failing to provide special benefits and is therefore a "special tax"].) But as we have stated: "The scope of judicial review of such [assessments] is . . . narrow. 'The board of supervisors is the ultimate authority which is empowered to finally determine what lands are benefited and what amount of benefits shall be assessed against the several parcels benefited . . . . This determination is made after a full hearing accorded to all persons interested to make such objection as they see fit. In such a case the court will not declare the assessment void unless it can plainly see from the face of the record, or from facts judicially known, that the assessment so finally confirmed is not proportional to the benefits, or that no benefits could accrue to the property assessed." (*Dawson, supra,* 16 Cal.3d at p. 684; see also *Knox* v. *Orland, supra,* 4 Cal.4th 132, 147 [reaffirming the validity of the *Dawson* standard]; see also *J.W. Jones Companies* v. *City of San Diego* (1984) 157 Cal.App.3d 745 [203 Cal.Rptr. 580] [approving benefit assessment for new development based on long-range estimates of the need for public facilities generated by the new development].)

Moreover, even if a special assessment is found to be disproportionate to the benefit provided, and therefore a "special tax" within the meaning of article XIII A, section 4 of the California Constitution, it does not follow that the assessment would also be a taking. The conclusion that a development fee is really a special tax only signifies that the fee cannot be adopted without the approval of two-thirds of the electorate, not that it cannot be lawfully adopted at all, as would be the case were the assessment a taking.

. . . .' " (*Id.* at p. 61 [107 L.Ed.2d at p. 302]; see also *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith* (1980) 449 U.S. 155, 163 [66 L.Ed.2d 358, 366, 101 S.Ct. 446] [user fees will be upheld if they have some police power justification].)

Many development fees bear a close resemblance to the excise taxes, assessment fees and user fees discussed above. They are perhaps best characterized as a special assessment placed on developing property, calculated according to preestablished legislative formulae based on square footage or per unit of development. (See *J.W. Jones Companies* v. *City of San Diego, supra,* 157 Cal.App.3d 745 [fee apportioning projected future public costs of development among developers in several areas of the city]; see also *Tahoe Keys Property Owners' Assn.* v. *State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459 [28 Cal.Rptr.2d 734] [$4,000 per lot environmental mitigation fee]; *Garrick Development Co.* v. *Hayward Unified School Dist.* (1993) 3 Cal.App.4th 320 [4 Cal.Rptr.2d 897] [school fees of $1.50 per square foot of nonresidential development]); *Blue Jeans Equities West* v. *City and County of San Francisco* (1992) 3 Cal.App.4th 164, 170-171 [4 Cal.Rptr.2d 114] [transportation fee of up to $5 per square foot levied on commercial development]; *Commercial Builders* v. *Sacramento* (9th Cir. 1991) 941 F.2d 872, 874-875 [upholding low-income housing fee on commercial development according to legislated formula]; *Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218 [1 Cal.Rptr.2d 818] [school fees of $1.50 per square foot].) Courts have granted considerable discretion to local government to impose such fees, and have upheld them against takings and related challenges. (See, e.g., *Garrick Development Co.* v. *Hayward Unified School Dist., supra,* 3 Cal.App.4th at p. 337; *Tahoe Keys Property Owners' Assn.* v. *State Water Resources Control Bd., supra,* 23 Cal.App.4th at pp. 1477-1478; *Blue Jeans Equities West* v. *City and County of San Francisco, supra,* 3 Cal.App.4th at pp. 170-171; *Commercial Builders* v. *Sacramento, supra,* 941 F.2d at pp. 874-875.)

The above cases illustrate the difference, for purposes of takings clause jurisprudence, between judicial review of the government's physical taking of property and its charging of fees. A comparison of these cases with *Loretto, supra,* 458 U.S. 419, brings this difference into clearer focus. While laws that impose generally applicable taxes, assessments and fees will be upheld if they are rationally based, an equivalent, generally applicable measure that authorizes the physical occupation of a small portion of property belonging to a large class of property owners—forced access for cable television wires and boxes—is deemed to be a taking. (*Loretto, supra,* 458 U.S. at p. 438 [73 L.Ed.2d at p. 884].) It is therefore illogical doctrinally to assert, as plaintiff and his numerous amici curiae do in this case, that

development fees will invariably be subject to the same rigorous constitutional scrutiny as compelled dedications of property.

In sum, it does not appear that *Nollan* or *Dolan* alter the restricted judicial review applicable to general governmental fees—a restriction rooted in the separation of powers doctrine—merely because a property owner can recast · his challenge to a fee as a takings claim, asserting that he was being asked to pay for a disproportionate share of public improvements or services in exchange for a development permit. On the contrary, the cases show that the constitutionality of such fees will be judged under a standard of scrutiny closer to the rational basis review of the equal protection clause than the heightened scrutiny of *Nollan* and *Dolan.*

This is not to imply that legislative development fees do not implicate the takings clause. Because these fees are forms of land use regulation, they must "advance legitimate state interests." (*Agins* v. *Tiburon, supra,* 447 U.S. at p. 260 [65 L.Ed.2d at p. 112].) A disproportionate fee raises the possibility of arbitrary or discriminatory government action. But *Nollan* and *Dolan* do not change the basic principle that courts will not unduly interfere with the essentially legislative function of adopting fees and fee structures that advance the public interest. In other words, such fees are "public program[s] adjusting the benefits and burdens of economic life to promote the common good" which will be reviewed by courts in a more deferential manner than physical invasions of property. (*Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. at p. 124 [57 L.Ed.2d at p. 648].)

Of course, a court's constitutional inquiry will vary with the nature of the state interest purporting to justify the monetary exaction under review. If the government's interest is in raising revenue generally, then courts will uphold the tax so long as the special burden it imposes on developers is rationally based. If, as in the case of the art in public places fee at issue in this case, the fee is for the purpose of furthering certain legitimate aesthetic objections, then this fee will be upheld if it can be shown to substantially further those objections. If the fee is imposed to mitigate the impacts of development, then it will be upheld if there is a reasonable relationship between the fee and the development impact. (See *Associated Home Builders etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633, 640 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847].) If the fee is defined as a user fee, then the fee will be upheld if there is a reasonable relationship between the government's cost of service and the fee. But in each of these cases, the degree of scrutiny is not appreciably different. Courts will, for federal constitutional purposes, defer to the legislative capacity of the states and their subdivisions to calculate and charge fees designated for legitimate government objectives, unless the fees are plainly arbitrary or confiscatory.

There are, of course, a number of legal constraints in this state—other than the Fifth Amendment—on the government's ability to impose development fees. Government Code section 66000 et seq. extensively regulates the imposition of development fees, including requirements that the purpose of the fee must be identified with specificity, and that a "reasonable relationship" must exist between the fee's use and the type of development project on which the fee is imposed. (Gov. Code, § 66001, subd. (a)(3).)[2] The statutory scheme also mandates a public hearing process for the adoption of a fee, and a procedure for the refund of unused portions of the fee. (Gov. Code, §§ 66001, subds. (e) & (f), 66016-66018; see also *Garrick Development Co.* v. *Hayward Unified School Dist.*, supra, 3 Cal.App.4th 320.) Moreover, a development fee which exceeds the burdens and benefits of development will be found to be a special tax that requires two-thirds voter approval under article XIII A, section 4 of the California Constitution. (See *Bixel Associates* v. *City of Los Angeles* (1989) 216 Cal.App.3d 1208, 1220 [265 Cal.Rptr. 347] [invalidation of excessive fire hydrant fee as a special tax]; *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1984) 165 Cal.App.3d 227, 238 [211 Cal.Rptr. 567] [invalidation of water system hookup fee as a special tax].)

---

[2] I agree with the plurality that Government Code section 66001 incorporated a "reasonable relationship" standard set forth in *Associated Home Builders etc., Inc.* v. *City of Walnut Creek*, supra, 4 Cal.3d at page 640, and its progeny, a standard less exacting than *Dolan*'s "rough proportionality" test. A review of the legislative history of Assembly Bill No. 1600, 1987-1988 Regular Session (Assembly Bill No. 1600), which included section 66001, confirms that view. In an analysis of Assembly Bill No. 1600 by the Senate Local Government Committee immediately before the enactment of the bill, it was stated: "The U.S. Supreme Court's June 26 *Nollan* [case] overturned the California Coastal Commission's imposition of a lateral public access easement as a condition of approving a residential development in the coastal zone. . . . Some observers have interpreted this decision as an instruction to local agencies to find a more direct link between exactions and public purposes. [Assembly Bill No.] 1600 moves in this direction. The issue will be whether it goes far enough. Because the bill does not take effect until January 1, 1989, the Legislature will have ample opportunity to conform it with the *Nollan* case, if it chooses." (Sen. Local Gov. Com. Rep. on Assem. Bill No. 1600 (1987-1988 Reg. Sess.) as amended Aug. 18, 1987, p. 2.) The fact that the Legislature did not amend the bill after that indicates that it did not intend to fully incorporate the *Nollan* standard to development fees, much less the *Dolan* standard formulated seven years later. The same report also makes clear that the "reasonable relationship" standard of section 66001 was intended to "conform to case law," i.e., *Associated Home Builders* and related California cases. (Sen. Local Gov. Com. Rep. on Assem. Bill No. 1600 at p. 3.)

Whether the less demanding statutory standard or more demanding constitutional standard applies is ultimately a constitutional question and depends, as I have argued, and as the other members of this court appear to agree, on whether or not the fee is generally applicable. Whichever standard applies, the plurality is, of course, correct in concluding that anyone challenging either the statutory or constitutional validity of a development fee must follow the procedures set forth in Government Code section 66020 et seq. And, while section 66001 cannot be said to have incorporated the *Nollan/Dolan* standard in any formal sense, I agree with the plurality that "the term 'reasonable relationship' embraces both constitutional and statutory meanings which, for all practical purposes, have merged *to the extent* that the *Dolan* decision applies to development fees . . . ." (Plur. opn., ante, at p. 867, italics in original.)

Even under more deferential review, a court's inquiry into the validity of the reasonable relationship between a development fee and a development impact will not be a "rubber stamp." (See, e.g., *Shapell Industries, Inc.* v. *Governing Board, supra,* 1 Cal.App.4th 218, 235-236; *Balch Enterprises, Inc.* v. *New Haven Unified School Dist.* (1990) 219 Cal.App.3d 783, 794-795 [268 Cal.Rptr.2d 543].)[3] But *Nollan* and *Dolan* in most cases impose no *additional* constitutional burden on the government to justify development fees beyond the burden it already bears under the state constitution and statute. (See *Garrick Development Co.* v. *Hayward Unified School Dist., supra,* 3 Cal.App.4th at p. 337; *Blue Jeans Equities West* v. *City and County of San Francisco, supra,* 3 Cal.App.4th at p. 171.)

In sum, general development fees will usually be subject to a less exacting standard of review under the takings clause than the physical taking of property.

## C. *Nollan, Dolan and the Recreation Fee.*

Nonetheless, I agree with the plurality that a somewhat higher level of constitutional scrutiny should be applied to a development fee when it is imposed "neither generally nor ministerially, but on an individual and discretionary basis." (Plur. opn., *ante,* at p. 876.) The heightened scrutiny under these circumstances is derived from *Nollan*'s and *Dolan*'s central concern that government not convert a valid regulation of land use into " 'an out-and-out plan of extortion' " (*Dolan, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 317, 114 S.Ct. at p. 2317], quoting *Nollan, supra,* 483 U.S. at p. 837 [97 L.Ed.2d at p. 689]) that does not advance a *legitimate* governmental objective. Although development fees are not physical takings of property, they bear greater similarity to physical takings than to zoning and other such land-use regulations in this sense: both physical and monetary exactions require developers to directly contribute valuable assets to the public weal in exchange for permission to develop their property. In both cases, there is a potential for the government to engage in extortionate behavior. This risk diminishes when the fee is formulated according to preexisting statutes or ordinances which purport to rationally allocate the costs of development among a general class of developers or property owners—indeed, as discussed above, the separation of powers doctrine clothes such a fee in a presumption of constitutionality. But when the fee is

---

[3]Indeed, it is arguable that even under a more deferential standard of review, the recreation fee in this case would have been invalid, because it was based on a fundamental methodological or conceptual flaw. (See, e.g., *Shapell Industries, Inc.* v. *Governing Board, supra,* 1 Cal.App.4th at pp. 235-236 [school fee erroneously attributing all future expansion of enrollment to new development partially invalid].)

ad hoc, enacted at the time the development application was approved, there is a greater likelihood that it is motivated by the desire to extract the maximum revenue from the property owner seeking the development permit, rather than on a legislative policy of mitigating the public impacts of development or of otherwise reasonably distributing the burdens of achieving legitimate government objectives.

Indeed, even in the case of zoning regulations, to which courts have been traditionally deferential, a more rigorous form of judicial review, fueled by a suspicion of legislative motive, has been employed when the regulation applies uniquely to a single property owner—so-called "spot zoning." Spot zoning is said to exist " '[w]here a small parcel is restricted and given less rights than the surrounding property . . . .' " (*Ross* v. *City of Yorba Linda* (1991) 1 Cal.App.4th 954, 960 [2 Cal.Rptr.2d 638].) When the zoning ordinance appears to subject a property owner to a special restriction not applicable to similarly situated adjacent property, courts will conduct a more searching inquiry into the reasons and motives of the legislative body to determine if the zoning is arbitrary and discriminatory. (See *Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332, 338 [175 P.2d 542]; *Ross* v. *City of Yorba Linda, supra,* 1 Cal.App.4th at pp. 962-963; *Arnel Development Co.* v. *City of Costa Mesa* (1981) 126 Cal.App.3d 330, 337 [178 Cal.Rptr. 723]; see also Longtin, California Land Use (1995 supp.) § 1.34.) As explained in *Arnel Development Co.*: "The usual test when a zoning ordinance is attacked as being in excess of the police power is whether or not the ordinance bears a substantial and reasonable relationship to the public welfare. [Citations.] However, '[t]he principle limiting judicial inquiry into the legislative body's police power objectives does not bar scrutiny of a quite different issue, that of discrimination against a particular parcel of property. "A city cannot unfairly discriminate against a particular parcel of land, and the courts may properly inquire as to whether the scheme of classification has been applied fairly and impartially in each instance." ' " (*Arnel, supra,* 126 Cal.App.3d at p. 336.)

In the same manner, when a municipality singles out a property developer for a development fee not imposed on others, a somewhat heightened scrutiny of that fee is required to ensure that the developer is not being subject to arbitrary treatment for extortionate motives. These singular fees present a greater possibility that the government is unfairly imposing disproportionate public burdens on a lone, and therefore particularly vulnerable, property owner. Hence the need for closer judicial review.[4]

That is not to imply that a local government's actions will be subject to heightened scrutiny each time it engages in the *individualized* assessment of

---

[4]I note that the distinction between generally applicable regulations and those imposed discretionarily on a single-property owner is critical in the context of takings jurisprudence

a development project's public impacts. Indeed, such assessments may be preferable, for reasons of fairness and accuracy, to fees that are completely predetermined according to rigid legislative formulae, and it would be illogical to impose on them more formidable constitutional hurdles. But when, as in this case, the local government exacts a type of development fee which is imposed on no one else, and which is based on no preexisting legislative guidelines, a more searching constitutional inquiry into the basis of the fee is required.

Thus, the type of judicial review set forth in *Nollan* and *Dolan* is necessary, under the limited circumstances described above, to ensure "that the [government's] monopoly power over development permits is not illegitimately exploited by imposing conditions that lack any logical affinity to the public impact of a particular land use." (Plur. opn, *ante*, at p. 876.) I therefore conclude that the recreation fee at issue in the present case is required to meet the "rough proportionality" standard prescribed under *Dolan*.

## II.

As stated above, I concur in the plurality's analysis of the recreation fee. I would add two additional points.

First, this is not a case in which the government has asserted an interest in the protection of specific facilities or improvements, as when government regulates the closure or conversion of rental housing. (See *Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892, 898-899 [223 Cal.Rptr. 379] [controls on conversion of residential hotels and requirements to contribute to replacement costs upheld]; *Nash v. City of Santa Monica* (1984) 37 Cal.3d 97 [207 Cal.Rptr. 285, 688 P.2d 894] [upholding ordinance controlling exit from rental housing business]; Gov.

---

only when monetary fees, rather than the physical occupation of land, is in question. As explained above, even generally applicable laws which authorize the physical occupation of property are takings (see *Loretto, supra*, 458 U.S. at pp. 436-437 [73 L.Ed.2d at p. 883]), or, in the case of regulations that occur in the development permit process, subject to a greater presumption that a taking has occurred. (*Dolan, supra*, 512 U.S. at pp. __-__ [129 L.Ed.2d at pp. 311-312, 322-323, 114 S.Ct. at pp. 2313, 2321-2322].) Thus in *Dolan*, the bicycle path dedication regulations were legislatively formulated, derived from the City of Tigard's Community Development Code, which mandated dedication of land for bicycle pathways consistent with a bicycle/pedestrian pathway plan. (*Id.* at p. __ [129 L.Ed.2d at pp. 311-312, 114 S.Ct. at p. 2313].) Although it may have been constitutionally permissible for the city to impose a bicycle path "tax" or assessment on all downtown developers, with little or no showing of the individual impact of each development, it was not similarly constitutional to compel developers to cooperate in the city's land banking scheme by requiring them to dedicate a portion of their property to the city for a bicycle path in fulfillment of the city's general plan, irrespective of the public impacts of their developments.

Code, § 65863.7, subd. (e) [authorizing local governments to require that mobilehome park owners who close their facilities pay the "reasonable costs of relocation"]; Gov. Code, § 7060.1, subd. (c)(1) [affirming the power of public entities to "mitigate any adverse impact on persons" displaced as the result of the closure of residential hotels].) In such cases, the government may have a constitutionally legitimate interest in preserving an existing private facility that has public value, and in requiring mitigation fees if the facility is closed or put to a different use. But in the present case, the City had asserted no interest in preserving any particular facility, and had, indeed, permitted without condition the demolition of plaintiff's health club. As the plurality correctly conclude, the sole interest advanced by the City is in the preservation of a type of land use rather than of a facility, and any recreational fee must be measured in terms of the loss of that use.

Second, it should be recognized that although the City must employ a "rough proportionality" analysis on remand, the issue before it is a different one from that presented in *Nollan* and *Dolan*. In both those cases, the courts assumed that the developments in question had public impacts of some magnitude but found the evidence lacking that the taking of public easements significantly mitigated those impacts. (*Nollan, supra*, 483 U.S. at pp. 838-839 [97 L.Ed.2d at p. 690]; *Dolan, supra*, 512 U.S. at p. ___ [129 L.Ed.2d at pp. 321-323, 114 S.Ct. at pp. 2320-2322].) The question that must be addressed in the present case, on the other hand, is whether and to what extent the change in the recreational land use designation of plaintiff's property had a public impact—the loss of recreational opportunities to the residents the City—that would justify a special recreational fee. But assuming that a public impact is identified and a fee of some amount is constitutionally justified, there is no question that the City's proposed use of such fee—to construct public tennis courts or other such facilities—would directly mitigate that impact.

Thus, although the City must calculate the amount of the recreation fee in terms of the added costs of inducing the creation of *private* recreational facilities attributable to the changed land use (plur. opn., *ante*, at p. 884), it is not constitutionally forbidden from determining that the best use of the fee is to build *public* tennis courts or other facilities. It is the role of the legislative body, rather than the courts, to determine the best uses of the revenue obtained from a development fee, as long as the expenditure of the fee is reasonably related to the alleviation of the development impact that is its purported justification.

I also agree with the plurality that the art fee is a generally applicable fee substantially related to legitimate aesthetic objectives promoted by the City. It is therefore constitutional, and not subject to the *Nollan/Dolan* analysis.

**KENNARD, J., Concurring and Dissenting.—** ▮ I concur in the judgment insofar as it upholds the "art in public places" fee. I agree with the majority that this fee, imposed under an ordinance of general applicability, is not subject to the "essential nexus" and "rough proportionality" requirements that the United States Supreme Court established in *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] (*Nollan*) and *Dolan v. City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309] (*Dolan*) to determine whether certain development conditions violate the takings clause of the Fifth Amendment to the United States Constitution. I further agree with the majority that the art in public places fee is valid under traditional standards for judging the constitutional validity of development requirements of general applicability.

I dissent from the judgment insofar as it concludes that a city may impose a mitigation fee for the "loss" of private recreation facilities when property on which such facilities were located is redeveloped for a different use. On this issue, I agree with the majority that *Nollan-Dolan*'s "essential nexus" and "rough proportionality" requirements apply to monetary exactions that, like the mitigation fee involved here, are imposed on a specific parcel of property as a condition of obtaining a development permit. I also agree with the majority that a city may not impose a recreational mitigation fee in an amount sufficient to replace the "lost" private facilities with new public facilities. But I do not agree with the majority that a city may require a landowner to compensate the city for the projected expenses of (1) imposing development restrictions on other land, or (2) otherwise encouraging the construction of other private recreation facilities to replace those "lost" through redevelopment.

I further disagree with the plurality's decision, as expressed in Justice Arabian's opinion, to "gloss" certain state laws regulating mitigation fees (Gov. Code, § 66000 et seq.; hereafter Mitigation Fee Act) to make their provisions coincide exactly with the restrictions imposed by the takings clause of the Fifth Amendment to the United States Constitution. This case was litigated under the takings clause, not our state's Mitigation Fee Act; thus, there is no need to construe the Mitigation Fee Act to decide this case.

I

Between 1973 and 1975, Richard Ehrlich (Ehrlich) acquired a 2.4-acre lot in Culver City (City) and applied for approval to develop a private tennis club and recreational facility on the site. City amended its zoning and general plan ordinances and adopted a specific plan to allow for the construction of the facility. When developed by Ehrlich, the site had five tennis

courts, a heated swimming pool, a jacuzzi, paddle tennis courts, an aerobics area, and a separate building for lockers and other facilities.

In 1981, after a number of different managers had failed to make the private club operate at a profit, Ehrlich applied for approval to replace the private recreational club with an office building. When City's planning commission opposed the application on the ground that Ehrlich's private club filled a community need for recreational facilities, Ehrlich abandoned the application.

In August 1988, Ehrlich closed the facility because of continuing financial losses. He then applied for a specific plan amendment and tentative tract map approval to develop the site into a 30-unit townhouse project.

City initially expressed interest in acquiring the property for use as a city-owned recreational facility. Its staff advised City that Ehrlich's property offered an opportunity "to preserve an existing sports/recreational facility for public use and relieve pressure on existing facilities." An independent feasibility study commissioned by City concluded that, according to national standards, City needed two to four tennis courts and more public swimming pools and gymnasiums. Although the study criticized Ehrlich's operation of the private club formerly on the property, it also found that extensive capital improvements would be necessary to make the site financially viable for recreational use.

In March 1989, Ehrlich obtained a demolition permit and demolished the recreational facilities at the site, donating to City the equipment that was still useful after demolition. In April 1989, City decided, based on its independent feasibility study, that it did not have sufficient funds to acquire the site and use it as a public sports complex. It also decided not to assume the substantial financial risks involved in acquiring the property for operation on a membership, fee-for-service basis. Based on its concern about the loss of recreational land use, City denied Ehrlich's application to develop the site with townhouses.

In subsequent discussions with City, Ehrlich was told that his development application would be granted only if he agreed to build new recreational facilities for City. In response, Ehrlich filed, but did not serve, the petition for writ of mandate and complaint for damages in this case. City then rescinded its earlier denial of Ehrlich's application and granted it subject to certain conditions, including payment of a $280,000 recreational mitigation fee and a $33,200 "art in public places" fee. The recreational mitigation fee was to be used "for additional recreational facilities" to

replace the facilities "lost" when Ehrlich ceased using his property for commercial recreational purposes. The amount of this fee was based on City's estimate of the cost of building public recreational facilities. The "art in public places" fee was imposed under a municipal ordinance that requires commercial projects with a value in excess of $500,000 to either provide art work for the project in an amount equal to 1 percent of the total value of the building or to pay an equal amount to the City art fund.[1]

Ehrlich formally protested both the recreational mitigation fee and the "art in public places" fee. When City denied his protests, Ehrlich amended his pleadings in this action to allege that the fees were an unconstitutional taking. Ehrlich and City then agreed that Ehrlich would pay the fees under protest, retaining the right to proceed with this lawsuit, in return for City's issuance of the necessary development permits.

In Ehrlich's action, the trial court invalidated the $280,000 recreational mitigation fee because it was "simply an effort to shift the cost of providing a public benefit to one no more responsible for the need than any other taxpayer." The trial court upheld the constitutionality of the $33,200 "art in public places" fee.

The Court of Appeal initially affirmed the trial court's judgment, but then granted a rehearing and, in a published opinion (*Ehrlich* v. *City of Culver City* (1993) 15 Cal.App.4th 1737 [19 Cal.Rptr.2d 468]), reversed the trial court's ruling that the $280,000 fee was an unconstitutional taking. The Court of Appeal reasoned that there was a substantial nexus between the proposed project and the fee because the fee compensated City for the burden to the community caused by the "loss" of Ehrlich's private recreational facilities. (*Id.* at p. 1750.) The United States Supreme Court then granted certiorari and remanded the case to the Court of Appeal "for further consideration in light of *Dolan* v. *City of Tigard*, 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309]. . . ." (*Ehrlich* v. *City of Culver City* (1994) 512 U.S. __ [129 L.Ed.2d 854, 114 S.Ct. 2731-2732].) On remand, a divided Court of Appeal, this time in an unpublished opinion, again upheld the $280,000 recreational mitigation fee. We granted review.

## II

The Fifth Amendment to the United States Constitution, made applicable to state and local governments by the Fourteenth Amendment, prohibits the

---

[1]City also required Ehrlich to pay a $30,000 parkland fee to provide for anticipated increased demand on public park and recreational facilities by the residents of the proposed townhouse development. Ehrlich has not contested the validity of this fee and it is not at issue on this appeal.

government from taking private property for public use without just compensation. "One of the principal purposes of the Takings Clause is 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" (*Nollan, supra,* 483 U.S. 825, 835-836, fn. 4 [97 L.Ed.2d at p. 688], quoting *Armstrong* v. *United States* (1960) 364 U.S. 40, 49 [4 L.Ed.2d 1554, 1561, 80 S.Ct. 1563].)

In two landmark decisions—*Nollan, supra,* 483 U.S. 825, and *Dolan, supra,* 512 U.S. 374—the United States Supreme Court has defined the scope of the protection that the Fifth Amendment's takings clause affords in the context of conditions imposed on the granting of land use permits. In so doing, the court has drawn a distinction between conditions legislatively imposed by laws or rules of general applicability, on the one hand, and conditions adjudicatively imposed on specific parcels, on the other hand.

If a condition is imposed pursuant to an ordinance or rule of general applicability—that is, as a result of a legislative determination—the condition is constitutionally permissible unless the landowner meets his or her burden of proving that the condition either does not substantially advance a legitimate governmental purpose or deprives the landowner of any economically viable use of the land. (*Dolan, supra,* 512 U.S. 374, ___, fn. 8 [129 L.Ed.2d 304, 315-317, 320, 114 S.Ct. 2309, 2316-2317, 2320]; *Agins* v. *Tiburon* (1980) 447 U.S. 255, 260 [65 L.Ed.2d 106, 111-112, 100 S.Ct. 2138].)

If a condition is *adjudicatively* imposed, however, the government bears the burden of establishing (1) that the condition has an "essential nexus" with a legitimate government interest that would have justified denial of the permit, and (2) that there is a "rough proportionality" between the burden imposed by the condition and the projected impact of the proposed development. (*Dolan, supra,* 512 U.S. 374, ___ [129 L.Ed.2d 304, 317-318, 114 S.Ct. 2309, 2317-2319]; *Nollan, supra,* 483 U.S. 825, 834-837 [97 L.Ed.2d 677, 687-689].)

With these standards in mind, I proceed to the issues presented here.

A. *The Mitigation Fee Act*

As a preliminary matter, the plurality, as explained in Justice Arabian's opinion, decides to "gloss" the provisions of California's Mitigation Fee Act (Gov. Code, § 66000 et seq.) to make its provisions correspond to the standards that the United States Supreme Court enunciated in *Nollan, supra,* 483 U.S. 825, and *Dolan, supra,* 512 U.S. 374. (Plur. opn., *ante,* at pp. 859-860, 866.) I see no need for this. Ehrlich has not challenged the validity

of the Mitigation Fee Act, nor was this issue addressed by the trial court. In the event of some conflict between the standards set forth in the Mitigation Fee Act and the standards required by the federal Constitution, the constitutional standards must necessarily control. Accordingly, the issue in this case is constitutional, not statutory.

### B. The "Art in Public Places" Fee

The "art in public places" fee was imposed under a municipal ordinance of general applicability. Accordingly, the $33,200 fee is constitutionally valid unless Ehrlich proves that the fee either does not serve a legitimate government purpose or deprives him of any economically viable use of the land. (*Dolan, supra,* 512 U.S. 374, __, fn. 8 [129 L.Ed.2d 304, 315-317, 320, 114 S.Ct. 2309, 2316-2317, 2320].) Enhancing the aesthetic environment of the community is a legitimate government purpose, and Ehrlich has not demonstrated that the amount of the fee, which equals only 1 percent of the project value, makes the project economically unfeasible or otherwise deprives him of any economically viable use of the land. Accordingly, I concur with the majority that this fee is constitutionally permissible.

### C. The Recreational Mitigation Fee

#### 1. Is Nollan-Dolan applicable to a monetary fee?

In both *Nollan, supra,* 483 U.S. 825, and *Dolan, supra,* 512 U.S. 374, the condition at issue required the landowner to grant a possessory interest in part of the property to the public or to the government. Seizing on this factual circumstance, City here contends that *Nollan-Dolan*'s "essential nexus" and "rough proportionality" requirements apply only to such conditions and not to conditions requiring payment of a sum of money, however large. The majority rejects this contention, holding that the "essential nexus" and "rough proportionality" requirements imposed by the United States Supreme Court's construction of the takings clause apply not only to conditions requiring surrender of a possessory interest in land, but also to conditions requiring monetary payments, provided that the conditions are *adjudicatively* imposed in a discretionary permit process. (Plur. opn., *ante,* at pp. 860, 866-868; conc. & dis. opn. of Werdegar, J., *post,* at p. 912.) For the reasons given by the majority, I concur in this holding.

Because the $280,000 recreational mitigation fee was imposed on Ehrlich's development application individually, and not pursuant to an ordinance or rule of general applicability, the constitutionality of this fee is evaluated using the *Nollan-Dolan* "essential nexus" and "rough proportionality" analysis.

## 2. *Essential Nexus*

The first component in the *Nollan-Dolan* analysis is determining whether the challenged condition has an "essential nexus" with a legitimate government interest that would have justified denial of the permit. This component, in turn, may be broken down into three steps: (1) determining whether the government could have denied the permit application entirely; (2) identifying one or more legitimate government interests that would have justified denial of the permit application; (3) determining whether the condition has an "essential nexus" with the impact of the proposed development on one or more of the identified interests.

The denial of a land-use permit application effects a taking of the property, for which the government must pay compensation, if the denial does not substantially advance a legitimate state interest or if it deprives the owner of " 'economically viable use of his land.' " (*Dolan, supra,* 512 U.S. 374, __ [129 L.Ed.2d 304, 316, 114 S.Ct. 2309, 2316], quoting *Agins* v. *Tiburon, supra,* 447 U.S. 255, 260 [65 L.Ed.2d 106, 112]; see also *Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003, 1016, 1017 [120 L.Ed.2d 798, 813, 112 S.Ct. 2886, 2894-2895].) Thus, it is necessary to determine whether denial of Ehrlich's permit application would have deprived him of economically viable use of his land. The majority entirely omits this part of the analysis.

Here, Ehrlich's permit application had two purposes: (1) to remove the specific plan restriction that Ehrlich's property be used only for a private recreational club; and (2) to authorize development of the property with a thirty-unit townhouse complex. The evidence presented in the record raises a substantial question as to whether a private recreational club was an economically viable use of the property. Ehrlich had attempted to use the property for this purpose for a period of years but was unable to make it profitable despite several changes of management. Moreover, City itself declined to assume ownership of the property for the purpose of itself operating the private recreational club, concluding that the financial risk would be too great.

A conclusion that a private health club was not an economically viable use of the property would not mean, of course, that City was required to grant the specific alternative use that Ehrlich requested: a 30-unit townhouse complex. But it would mean that City would be required to authorize *some* economically viable alternative use, rather than simply denying all applications for redevelopment to other uses.

Although the record raises serious doubts on the issue, I need not and do not decide whether City could have completely denied Ehrlich's permit

application on the basis of the government interest in maintaining adequate private recreational facilities because, as explained below, I conclude that the recreational mitigation fee fails another part of the *Nollan-Dolan* test.

Assuming, for purposes of argument, that a denial of Ehrlich's permit application would not have deprived him of an economically viable use of his property, would the condition that he pay a recreational mitigation fee have an "essential nexus" to a legitimate government interest?

I do not doubt that a city has a legitimate government interest in providing adequate recreational facilities, both public and private, for its residents. But a city's exaction of a "recreational mitigation fee" from a landowner as a condition of permit approval must satisfy the *Nollan-Dolan* requirement of an "essential nexus" between the fee and the city's interest in denying the proposed development application. (*Nollan, supra,* 483 U.S. 825, 837 [97 L.Ed.2d 677, 689].)[2] I need not decide in this case whether the recreational mitigation fee satisfies this essential nexus requirement, however, because as I explain below, the fee fails under the "rough proportionality" test.

### 3. *Rough Proportionality*

The second component in the *Nollan-Dolan* analysis is determining whether there is a "rough proportionality" between the burden imposed by the permit approval condition and the projected impact of the proposed development. (*Dolan, supra,* 512 U.S. 374, __ [129 L.Ed.2d 304, 317-321, 114 S.Ct. 2309, 2317-2320].)

Because Ehrlich's proposed construction of 30 townhouses on his land would have increased the community's housing stock and thus the number of its residents, City could reasonably impose a fee to offset the increased demand on public recreational facilities attributable to the increase in population resulting from the development. City did exactly this by imposing a $30,000 "parkland" fee. (See fn. 1, *ante.*) Ehrlich has not disputed the validity of this fee.

The $280,000 recreational mitigation fee that City imposed on Ehrlich was designed not to offset the increased demand on public recreational

---

[2]Whether an essential nexus exists turns on the connection between the condition imposed on the development and "the projected impact of the proposed development" (*Dolan, supra,* 512 U.S. 374, __ [129 L.Ed.2d 304, 317, 114 S.Ct. 2309, 2317]). The United States Supreme Court has not yet clarified whether "the projected impact" includes only positive effects such as the additional burdens that the new development will impose on the community (in this case, the increased demand for city services resulting from the addition of 30 townhouses) or also negative effects such as the reduction in the total area of land zoned for a particular use (in this case, the reduction in land designated for recreational uses) or the loss of public benefits from the preexisting use of the land (in this case, the benefits City residents derived from use of the athletic facilities).

facilities caused by the addition of 30 residential units, but instead to compensate for the "loss" of the private recreational club that had previously existed on the property. The distinction is crucial.

The majority partly rejects and partly accepts City's "lost use" or "lost opportunity" rationale for the recreational mitigation fee.

The majority rejects the rationale insofar as it is based on the assumption that a landowner may be required, as a condition to redeveloping property for a different use, to replace private facilities on the property with comparable public facilities. Thus, as the majority recognizes, City may not require Ehrlich to build public recreational facilities to replace the private facilities that existed on his property, nor may it impose a fee in an amount calculated to achieve this end. As the majority aptly states, City "may not constitutionally measure the magnitude of its loss, or of the recreational exaction, by the value of facilities it had no right to appropriate without paying for." (Plur. opn., *ante*, at p. 883.)

But the majority accepts City's "lost use" or "lost opportunity" rationale insofar as it is based on the assumption that a landowner may be required, as a condition to redeveloping property for a different use, to underwrite any government expense likely to be incurred in the process of replacing private facilities on the property with comparable private facilities on other privately owned land. Thus, the majority concludes that City may charge Ehrlich a recreational mitigation fee measured either by "the additional administrative expenses incurred in redesignating other property within Culver City for recreational use" (plur. opn., *ante*, at p. 883; see also conc. & dis. opn. of Werdegar, J., *post*, at p. 912) or by the "monetary incentives" needed "to induce private health club development" on other land (plur. opn., *ante*, at p. 884; see also conc. & dis. opn. of Werdegar, J., *post*, at p. 912). I disagree. A fee calculated in either manner would require Ehrlich to bear a grossly disproportionate share of what is essentially a public expense.

The fundamental flaw in the majority's reasoning is the assumption that City, without violating the takings clause, could restrict Ehrlich's property to private recreational uses. As discussed above, such a restriction might well deprive Ehrlich of economically viable use of his land and be invalid on that basis. But even if constitutionally valid on that basis, the restriction would be invalid because it impermissibly singled out Ehrlich's property for special restriction. This is akin to prohibited spot zoning.

"Spot zoning occurs where a small parcel is restricted and given lesser rights than the surrounding property, as where a lot in the center of a business or commercial district is limited to uses for residential purposes thereby creating an 'island' in the middle of a larger area devoted to other

uses." (*Viso* v. *State of California* (1979) 92 Cal.App.3d 15, 22 [154 Cal.Rptr. 580]; see also *Ross* v. *City of Yorba Linda* (1991) 1 Cal.App.4th 954, 960-961 [2 Cal.Rptr.2d 638].) Because "spot zoning" discriminates against the parcel singled out for special restriction, it is invalid unless the government establishes some reasonable ground for the disparate treatment. (See *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 132 [57 L.Ed.2d 631, 634-635, 98 S.Ct. 2646]; *Nectow* v. *Cambridge* (1928) 277 U.S. 183, 188-189 [72 L.Ed. 842, 844-845, 48 S.Ct. 447]; *Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332, 340-341 [175 P.2d 542]; *Reynolds* v. *Barrett* (1938) 12 Cal.2d 244, 251 [83 P.2d 29].)

Although City has a legitimate government interest in the promotion of private recreational facilities adequate to meet the recreational needs of its residents, in advancing this public interest City may not single out individual landowners or small groups of landowners to bear a disproportionate share of the burden. This is precisely what City does when it permits only recreational uses on an individual parcel that is otherwise indistinguishable from surrounding parcels on which a much broader range of uses is permitted.

Here, Ehrlich initially voluntarily accepted the recreational use restriction in 1975 as a condition of approval of the specific plan for the property. So long as Ehrlich continued to accept the benefits of the specific plan, he might well have been estopped to challenge the validity of the restriction. But Ehrlich has now waived all benefits he received under the previous specific plan in order to redevelop the property for a different use. Having surrendered the benefits, he should no longer be required to bear the burden of the recreational use restriction. City should now permit Ehrlich to use his property in a manner consistent with the uses of surrounding parcels, without unfairly penalizing him for his unsuccessful attempt to operate a private recreational club.

Had Ehrlich applied in 1975 for approval to build townhouses rather than a private recreational club, City would have had no reason to impose a fee for the "loss" of a recreational land-use designation. Absent some evidence that Ehrlich gained some enduring advantage or City suffered some lasting detriment as a result of Ehrlich's unsuccessful efforts to operate a private recreational club on his land, the removal of the recreational use restriction imposed in 1975 will not support the imposition of any additional fee. (See Kmiec, *At Last, the Supreme Court Solves the Takings Puzzle* (1995) 19 Harv. J. L. & Pub. Pol'y. 147, 156, fn. 43 [characterizing as an "extraordinary notion" the assertion "that once a private landowner has undertaken a permitted common law use, like [construction of] a private swimming pool or tennis court, he either must continue that use or must pay to stop"].)

For example, had Ehrlich received some subsidy as an inducement to accept the recreational use restriction, he might well be required to reimburse City for all or part of the subsidy upon abandonment of the use for which the subsidy had been given. But returning the subsidy he had received would be the extent of his obligation. There is neither justice nor logic in the majority's suggestion that Ehrlich may now be required to fund a subsidy to induce another landowner to accept a "spot zoning" of his or her property that would restrict that property to private recreational uses. Likewise, although Ehrlich may be required to pay an application fee to compensate for City's costs in processing his own permit applications, City may not require him also to underwrite City's administrative costs for land use proceedings relating to other parcels.

CONCLUSION

All of us must bear our fair share of the public costs of maintaining and improving the communities in which we live and work. But the United States Constitution, through the takings clause of the Fifth Amendment, protects us all from being arbitrarily singled out and subjected to bearing a disproportionate share of these costs. This constitutional protection does not evaporate when we discontinue a use of our property that we gratuitously undertook and that the government could not constitutionally have required us to continue, no matter how greatly the community may have benefited from that use.

Because I conclude that the trial court correctly decided the issues in this case, I would reverse the judgment of the Court of Appeal with directions to affirm the trial court's judgment.

Baxter, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting.— ■ ■ ■ ■ ■ I concur in the judgment. I also agree with the reasoning of the plurality opinion, except for that contained in part II, respecting the Mitigation Fee Act, Government Code section 66000 et seq. I agree with Justice Kennard there is no need for us to construe the act in order to decide this case. (Conc. and dis. opn. of Kennard, J., *ante*, at p. 903.) Accordingly, I would decline to do so.

The petition of appellant Richard K. Ehrlich for a rehearing was denied April 11, 1996. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.